## UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOE BALTAS, | : |
|     Plaintiff, | :    CIVIL ACTION NO. |
| | :    3:21cv469 (MPS) |
|     v. | : |
| KIM JONES, MICHAEL CALDERON, | : |
| DAVID MAIGA, and MONICA | : |
| RINALDI, in their individual capacities, | : |
|     Defendants. | : |

### <u>INITIAL REVIEW ORDER</u>

The plaintiff, Joe Baltas, is a sentenced prisoner incarcerated within the custody of the

Department of Correction ("DOC"). He has filed this civil rights complaint under 42 U.S.C. §

1983 against Deputy Warden Kim Jones, Correctional Counselor Michael Calderon, Deputy

Commissioner Monica Rinaldi, and Director of Classification and Population Management

David Maiga. *See* Compl., ECF No. 1. His complaint alleges violations of the United States

Constitution and the Racketeering Influenced and Corrupt Organizations Act ("RICO") that

occurred during his confinement at Garner Correctional Institution ("Garner") in 2018.

For the following reasons, the Court will permit some of Baltas's claims to proceed

beyond initial review.

### STANDARD OF REVIEW

Under 28 U.S.C. § 1915A(b), district courts must review prisoners' civil complaints

against governmental actors and *sua sponte* "dismiss . . . any portion of [a] complaint [that] is

frivolous, malicious, or fails to state a claim upon which relief may be granted," or that "seeks

monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see*

*also Liner v. Goord*, 196 F.3d 132, 134 & n.1 (2d Cir. 1999) (explaining that, under the Prisoner

Litigation Reform Act, *sua sponte* dismissal of frivolous prisoner complaints is mandatory);

*Tapia-Ortiz v. Winter*, 185 F.3d 8, 11 (2d Cir. 1999) ("Section 1915A requires that a district court screen a civil complaint brought by a prisoner against a governmental entity or its agents and dismiss the complaint *sua sponte* if, *inter alia,* the complaint is 'frivolous, malicious, or fails to state a claim upon which relief may be granted.'" (quoting 28 U.S.C. § 1915A)).

Rule 8 of the Federal Rules of Civil Procedure requires that a plaintiff plead only "a short and plain statement of the claim showing that the pleader is entitled to relief," *see* Fed. R. Civ. P. 8(a)(2), to provide the defendant "fair notice of what the . . . claim is and the grounds upon which it rests," *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level" and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555, 570. A claim is facially plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Complaints filed by *pro se* plaintiffs "must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F. 3d 471, 474 (2d Cir. 2006)) (internal quotation marks omitted); *see also Tracy v. Freshwater*, 623 F. 3d 90, 101–02 (2d Cir. 2010) (discussing the "special solicitude" courts afford pro se litigants).

## FACTUAL ALLEGATIONS

For purposes of initial review, the Court considers all of Baltas's allegations to be true.

2

Between January and February 2018, Baltas was issued approximately seven disciplinary reports, all but one of which were fabricated by correctional staff. Compl. at ¶ 20. Baltas pleaded guilty to three of the disciplinary reports in response to deals offered to him by DOC. *Id.* at ¶ 21.

On March 22, 2018, Baltas was housed in the Echo housing unit in general population. *Id.* at ¶ 22. At that time, Baltas became involved in an incident where a maintenance officer improperly entered Baltas's cell. *Id.* at ¶ 23. Based on his past experiences, Baltas believed the maintenance officer intended him harm and that he had entered his cell in violation of DOC policy. *Id.* at ¶ 24.

The maintenance officer brandished a screw driver, threatened him, and then exited the cell and shut the door. *Id.* at ¶ 25. Later, Lieutenant Frenis placed Baltas in restraints and escorted him to the Restrictive Housing Unit ("RHU") due to false disciplinary reports written by the maintenance officer charging Baltas with tampering with the cell door and interfering with fixing the door. *Id.* at ¶¶ 26-28. Baltas reported the maintenance officer for making threats and misconduct; after an investigation, the maintenance officer was dismissed from Garner and disciplined due to a finding of misconduct. *Id.* at ¶ 29.

Baltas was later found guilty of the offenses in the disciplinary reports. *Id.* at ¶ 30.

Defendant Deputy Warden Jones used the disciplinary reports to retaliate against Baltas and maliciously initiated a process to place Baltas on a restrictive status of Chronic Discipline. *Id.* at ¶¶ 31-32. State of Connecticut DOC Administrative Directive 9.4(3)(H) describes Chronic Discipline as "[a] restrictive housing status that results in management of an inmate whose behavior, while incarcerated, poses a threat to the security and orderly operation of the facility, or a risk to the safety of staff or other inmates due to repetitive

disciplinary infractions." *Administrative Directive Chapter 9 Classification*, Conn. Dept. of Corr., https://portal.ct.gov/DOC/AD/AD-Chapter-9 (last visited Dec. 3, 2021).[1]

On April 10, 2018, Baltas was visited by Investigator Sciascia, who provided him with notice of the Chronic Discipline Hearing. *Id.* at ¶ 33. At that time, Baltas requested advisor services from CTO Santilli, witnesses and evidence. *Id.* Sciascia informed him the witnesses and evidence would be handled by his advisor. *Id.* at ¶ 33. Sciascia also informed Hearing Officer Calderon that Baltas had requested CTO Santilli as his advisor for the hearing. *Id.* at ¶ 34.

On the morning of April 11, 2018, CTO Santilli sent an internal DOC email to Calderon and Sciasia inquiring about when the hearing would take place. *Id.* at ¶ 41. Calderon answered that Baltas had refused an advisor. *Id.* CTO Santilli responded with the following false statement: "Copy that, I went to see him and he told me he did not need an advisor." *Id.* Baltas never met with his advisor, despite having never refused an advisor; and he was also not provided with an opportunity to prepare for his hearing or secure evidence. *Id.* at ¶ 42. His hearing was meaningless as the outcome was predetermined. *Id.* at ¶ 43.

On April 11, 2018, Hearing Officer Calderon held the hearing with Baltas in a separate caged area. *Id.* at ¶ 35. Baltas told him he had not yet met with his advisor and had been unable to prepare or secure his evidence or witnesses. *Id.* at ¶ 36. His advisor was not present at his hearing. *Id.* Calderon stated that "none of that matters." *Id.* at ¶ 37. He indicated that the Deputy Wardens wanted him to be placed on Chronic Discipline status. *Id.* He stated that Baltas would

---

[1] The Court takes judicial notice of Administrative Directive 9.4, effective June 16, 2016. *Administrative Directive Chapter 9 Classification*, Conn. Dept. of Corr., https://portal.ct.gov/DOC/AD/AD-Chapter-9; *see also Nicholson v. Murphy*, No. 3:02-cv-1815 (MRK), 2003 WL 22909876, at *7 n.2 (D. Conn. Sept. 19, 2003) (taking judicial notice of Administrative Directives as "written guidelines, promulgated [under] Connecticut General Statutes § 18–81, establishing the parameters of operation for Connecticut facilities.").

not get an advisor or witnesses or evidence. *Id.* Calderon expressed that he was only following Deputy Warden Jones's instructions to him. *Id.* at ¶ 38.

Baltas explained that he should not be placed on Chronic Discipline based on the false disciplinary reports that were the result of harassment. *Id.* at ¶ 39. Baltas provided copies of other disciplinary reports that had been dismissed for lack of evidence because he had proven them false. *Id.*

Calderon stated that he was aware of these issues, but Deputy Warden Jones had decided that he should be placed on Chronic Discipline status. *Id.* at ¶ 40. Baltas was then returned to the RHU. *Id.*

On April 12, 2018, Calderon recommended that Baltas be placed on Chronic Discipline status due to his five Class A disciplinary offenses during a 180-day period. *Id.* at ¶ 44. Calderon falsely stated that Baltas's disciplinary reports had been dismissed due to "process failures." *Id.* at ¶ 44.

On April 20, 2018, Jones fraudulently forged Director Maiga's signature and fraudulently authorized Baltas's Chronic Discipline status. *Id.* at ¶ 48. *See* exhibit #3-2.

On April 24, 2018, Baltas appealed his Chronic Discipline placement to the Deputy Commissioner Monica Rinaldi. *Id.* at ¶ 53. On May 2, 2018, Director Maiga was provided with notice of Baltas's Chronic Discipline status that he allegedly did not authorize. *Id.* at ¶ 54. However, he took no action to remedy the unauthorized placement. *Id.* at ¶ 55.

On May 10, 2018, Captain Debra Synott wrote a response to Deputy Commissioner Rinaldi for the denial of Baltas's appeal without addressing any of the issues that he had raised therein. *Id.* at ¶ 56. Deputy Commissioner Rinaldi copied this response for her denial of Baltas's

appeal without conducting any meaningful review. *Id.* at ¶ 57. Had she conducted a meaningful review, she would have recognized that Baltas's Chronic Discipline status had not been properly authorized by Maiga. *Id.* at ¶ 58.

Baltas had no opportunity to present his views in person or in writing or to present any evidence to Maiga or the officers charged with making the Chronic Discipline placement decision. *Id.* at ¶ 59. Baltas was not provided with an opportunity to prepare or present a defense of any kind and was not afforded with a meaningful hearing or appellate review. *Id.*

As a result of his Chronic Discipline status, during a six month period, Baltas was subjected to:  isolation and solitary confinement; deprivation of all human contact and social activities; twenty-four hour a day cell confinement with only one hour five days a week for recreation in a cage the size of a parking space; having to strip prior to existing the cell; out-of-cell movement in restraints; deprivation of any meaningful activity; deprivation of hygiene products except one medicine cup of liquid soap and Q-Tips to clean teeth during shower period three times a week; no telephone access; no visitation; a limitation on six items of social mail; deprivation of personal property such as electronics, reading materials, consumable, and writing materials; deprivation of all cleaning materials; and inability to practice his religion. *Id.* at ¶¶ 61, 66. He had no access to the commissary or educational, work or religious programs or services, and no opportunity to exercise. *Id.* He could not exercise his religious practices because his housing did not permit the Native American practice of smudging, a daily activity that is crucial to his religion and spiritual well-being. *Id.* at ¶ 63. Other inmates designated as Native American at Garner are permitted to smudge every day. *Id.* at ¶ 64. He was also deprived of his sweat lodge practice, a monthly critical aspect of his religion. *Id.* at ¶ 65. Baltas wrote to Deputy Warden

Jones and Deputy Commissioner Rinaldi about the conditions of his Chronic Discipline and the denial of religious practices, but they took no corrective action. *Id.* at ¶ 68. In addition, Deputy Warden Jones was aware of all the conditions and practices because she tours the RHU on a weekly basis. *Id.* at ¶ 68.

Director Maiga refused to conduct any reviews of Baltas's Chronic Discipline placement, which are required every thirty days under the DOC Administrative Directives. *Id.* at ¶ 67.

## III.    DISCUSSION

In this action, Baltas asserts claims of Fourteenth Amendment due process violation based on his placement in Chronic Discipline against all Defendants; First Amendment retaliation based on Jones's conduct to have him improperly placed in Chronic Discipline; Fourteenth Amendment due process violation for failure to conduct periodic reviews of his Chronic Discipline status against Maiga and Rinaldi; Eighth Amendment violation based on his conditions of confinement against all defendants; violation of his First Amendment right to free exercise of his religion against Defendants Jones and Rinaldi; and corruption, fraud, forgery, falsifying state records in violation of criminal statutes and RICO.[2]

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). In *Tangreti v. Bachmann*, the Second Circuit clarified the pleading standard applicable to supervisory defendants in cases concerning alleged violations of constitutional rights. Joining other Courts of Appeals that have addressed the issue, the Second Circuit now

---

[2] Baltas's ninth cause of action seeking liberal construction of his allegations, which is the standard of review for *pro se* complaints, does not state a plausible cause of action.

7

holds that "after *Iqbal*, there is no special rule for supervisory liability. Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' ... The violation must be established against the supervisory official *directly*." *Tangreti*, 983 F.3d 609, 618 (2d Cir. 2020) (emphasis added) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). To the extent Baltas asserts claims against supervisory officials, he must allege facts reflecting that a defendant had direct personal involvement in the violation.[3] Thus, the court will dismiss the claims against a supervisory defendant where Baltas has failed to satisfy the standard set forth in *Tangreti*.

### A.    Fourteenth Amendment Due Process

Baltas alleges that all defendants deprived him of his Fourteenth Amendment rights in connection with his placement on Chronic Discipline status.[4]

---

[3] Baltas's seventh cause of action asserts that Jones, Maiga and Rinaldi are liable for violation of his constitutional rights based on their failure to supervise subordinate staff.

[4] Baltas asserts his substantive due process rights have been violated. Baltas has not, however, alleged sufficient facts to raise such a claim. "The doctrine of substantive due process protects the individual against certain government actions regardless of the fairness of the procedures used to implement them," *McClary v. O'Hare*, 786 F.2d 83, 88 (2d Cir. 1986) (internal quotation marks and citations omitted), but the scope of the doctrine "is very limited," *Doe v. U.S. Merchant Marine Acad.*, 307 F. Supp. 3d 121, 156 (E.D.N.Y. 2018). A successful substantive due process claim requires that the plaintiff show "that the state action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 431 (2d Cir. 2009) (internal quotation marks and citations omitted). Here, Baltas has not alleged any conscience-shocking conduct. *See Lombardi v. Whitman*, 485 F.3d 73, 81 (2d Cir. 2007) ("In order to shock the conscience and trigger a violation of substantive due process, official conduct must be outrageous and egregious under the circumstances; it must be truly brutal and offensive to human dignity.") (internal quotation marks and alteration omitted). Moreover, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 272–73 (1994). Baltas's claim concerning his restrictive conditions of confinement may be reviewed under the Eighth Amendment. Thus, to the extent that Baltas seeks to add a Fourteenth Amendment substantive due process claim, such a claim is not plausible.

The Court must analyze a claim for a violation of procedural due process by (1) asking whether there exists a liberty or property interest of which a person has been deprived, and (2) if so, whether the procedures followed by the State in making that deprivation were constitutionally sufficient. *See Swarthout v. Cooke*, 562 U.S. 216, 219 (2011). In the prison context, which involves persons whose liberty interests have already been severely restricted because of their confinement, a prisoner cannot show a cognizable deprivation of "liberty" unless he can show that he was subjected to an "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). In that analysis, courts must examine the actual punishment that an inmate received, as well as the conditions and duration of the punishment. *See Davis v. Barrett*, 576 F.3d 129, 133–34 (2d Cir. 2009); *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004).

"[T]he duration of [segregated] confinement is a distinct factor bearing on atypicality and must be carefully considered." *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir. 2000). There is no "bright line rule that a certain period of [segregated] confinement automatically fails to implicate due process rights." *Palmer*, 364 F.3d at 64. Generally, a long period of segregation—such as more than 305 days—"is sufficiently atypical to trigger due process protections." *Ellerbe v. Jasion*, 2015 WL 1064739, at *5 (D. Conn. Mar. 11, 2015). "Where the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed record of the conditions of the confinement relative to ordinary prison conditions is required." *Palmer*, 364 F.3d at 64–65 (cleaned up). Accordingly, "restrictive confinements of less than 101 days do not generally raise a liberty interest warranting due process protection, and thus require proof of conditions more onerous than usual." *Davis,* 576 F.3d at 133; *Kalwasinski v. Morse*, 201 F.3d

103, 107–08 (2d Cir. 1999) (discussing factors relevant to deciding if confinement in SHU constitutes an atypical hardship).

For purposes of initial review only, Baltas's allegations that he endured harsh isolating conditions, including limited exercise in a cage and deprivation of human contact, for six months on Chronic Discipline status are sufficient to raise a liberty interest based on conditions that imposed atypical and significant hardship. Accordingly, the Court next considers whether Baltas was afforded all the process due in connection with his placement on Chronic Discipline.

The level of procedural protection required depends on the purpose of the hearing. *Bolden v. Alston*, 810 F.2d 353, 357 (2d Cir. 1987). For a disciplinary hearing, an inmate is entitled to the protections set forth in *Wolff v. McDonnell,* 418 U.S. 539 (1974). *See Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (inmates are entitled to "certain procedural protections when disciplinary actions subject them to further liberty deprivations such as loss of good-time credit or special confinement that imposes an atypical hardship); *Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999) (per curiam) (concluding that discipline resulting in atypical confinement may not be imposed without procedures enumerated in *Wolff*). "The *Wolff* Court, while holding that full adversary proceedings are not required for disciplinary deprivations of liberty in the prison setting, required written notice, adequate time to prepare a defense, a written statement of the reasons for action taken, and a limited ability to present witnesses and evidence." *Benjamin v. Fraser*, 264 F.3d 175, 190 (2d Cir. 2001) (footnote omitted).

By contrast, for a hearing with an administrative purpose, an inmate is entitled only to "some notice of the charges against him and an opportunity to present his views [either orally or

10

in writing] to the prison official charged with deciding" the matter as set forth in *Hewitt v. Helms,* 459 U.S. 460 (1983).[5] In *Wilkinson v. Austin*, 545 U.S. 209, 214 (2005), the Supreme Court determined that the process endorsed in *Hewitt* was sufficient before prisoners could be placed indefinitely for non-disciplinary reasons at a high-security "Supermax" prison. The Court explained that the more "formal, adversary-type procedures" of *Wolff* are appropriate to protect liberty interests such as an individual's removal from "free society for a specific parole violation" or revocation of "good-time credits for specific, serious misbehavior[,]" while *Hewitt*'s informal, non-adversary procedures apply for proceedings where "the inquiry draws more on the experience of prison administrators," and the state interest implicates prison safety and security. *Id.* at 228-229.

Under both *Hewitt* and *Wolff*, however, the standard governing the type or amount of evidence required to support a decision to place an inmate on an administrative or disciplinary/punitive status is some reliable evidence. *See, e.g.*, *Superintendent v. Hill*, 472 U.S. 445, 454 (1985) (procedural due process requires a disciplinary decision affecting an inmate's liberty interest to be "supported by some evidence in the record" of the inmate's guilt); *Elder v. McCarthy*, 967 F.3d 113, 129–30 (2d Cir. 2020) ("In this Circuit ... we have required that such disciplinary determinations be supported by some '*reliable* evidence' of guilt.") (quoting *Luna v. Pico*, 356 F.3d 481, 488 (2d Cir. 2004)); *Taylor v. Rodriguez*, 238 F.3d 188, 194 (2d Cir. 2001) (concluding that a prisoner facing confinement in close custody

---

[5] In *Hewitt*, the Supreme Court considered what process should be afforded an inmate who had been placed in administrative segregation pending an investigation into a disciplinary charge. *Id.* at 474. The Court explained that it was appropriate to place an inmate in administrative segregation who "represents a security threat" or to "complet[e] ... an investigation into misconduct charges." *Id.* at 476.

11

must be provided with a meaningful notice of the basis for the decision as well as a decision that is supported by "some evidence" that is "reliable") (citation omitted).

Baltas has alleged that Hearing Officer Calderon indicated that the Deputy Wardens had predetermined that he would be placed on Chronic Discipline status, that Deputy Warden Jones forged Maiga's signature, and that neither Director Maiga nor Deputy Commissioner Rinaldi corrected the unauthorized placement. Baltas also asserts that he never had an opportunity to present his views or defense regarding his placement. Thus, Baltas's allegations indicate that he was not afforded the procedural process due under either *Hewitt* or *Wolff* in connection with his Chronic Discipline status.[6] The Court will permit Baltas's procedural due process claim to proceed for further development against Defendants Director Maiga, Deputy Warden Jones, Hearing Officer Calderon, and Deputy Commissioner Rinaldi, who are all plausibly alleged to have direct involvement with Baltas's Chronic Discipline placement.

### B.      First Amendment Retaliation

Baltas alleges that Deputy Warden Jones had him placed on Chronic Discipline status in retaliation for his filing grievances and complaints.

The Second Circuit has instructed district courts to "approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (internal quotation marks omitted). Thus, retaliation claims must be supported by "specific and detailed factual allegations" and not "stated in wholly conclusory

---

[6] Thus the Court need not resolve at this time whether Baltas was entitled to the procedures under *Wolff* or *Hewitt*.

terms." *Id.* (internal quotation marks and citations omitted). To plead a First Amendment retaliation claim, an inmate must plausibly allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dolan*, 794 F.3d at 294 (internal quotation marks and citation omitted).

Protected speech or activity includes filing a lawsuit, an administrative complaint, or a prison grievance. *Baltas v. Maiga*, No. 3:20CV1177 (MPS), 2020 WL 6275224, at *8 (D. Conn. Oct. 26, 2020); *see Dolan*, 794 F.3d at 294 ("It is well established that retaliation against a prisoner for pursuing a grievance violates the right to petition [the] government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983.") (internal quotation marks and citations omitted). Thus, Baltas has satisfied the first prong of his retaliation claim because he has alleged that he filed numerous grievances and lawsuits against the defendants. Compl. at ¶ 31.

An adverse action, as required for the second prong, refers to "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis*, 320 F.3d at 353 (citation and internal quotation marks omitted). For initial pleading purposes, Baltas has sufficiently alleged the second prong based on his six month placement on Chronic Discipline status.

Baltas has not, however, alleged facts to raise an inference of causation. In order to allege causation, the inmate must state facts "suggesting that the protected conduct was a substantial or motivating factor in the [defendant's] decision to take action against [him]." *Moore v. Peters*, 92 F. Supp. 3d 109, 121 (W.D.N.Y. 2015) (quoting *Burton v. Lynch*, 664 F. Supp. 2d 349, 367

(S.D.N.Y. 2009)). "Some of the facts often used to determine retaliatory motive may include (1) temporal proximity between the protected conduct and the alleged retaliatory act, (2) the prisoner's prior good disciplinary record, (3) a finding of not guilty at the disciplinary hearing, and (4) statements by the officials showing motivation." *Ramos v. Semple*, No. 3:18-CV-1459 (VAB), 2019 WL 2422875, at *2 (D. Conn. June 10, 2019). Baltas has not alleged that Defendant Jones was aware of a complaint or grievance filed against her or that she had any specific reason to take retaliatory action against him. Thus, Baltas's retaliation claim is not plausible because he has not alleged "specific and detailed allegations" to support a causal connection between Jones's conduct and his protected activity. *See Dolan*, 794 F.3d at 295. Accordingly, Baltas's First Amendment retaliation claim against Jones must be dismissed as not plausible.

### C.    Periodic Reviews

Baltas  alleges that Director Maiga and Deputy Commissioner Rinaldi prolonged his Chronic Discipline status because they failed to conduct meaningful review of his Chronic Discipline placement.

In *Hewitt*, the Supreme Court held that "prison officials must engage in some sort of periodic review of the confinement" for an inmate placed on administrative segregation or detention to ascertain "whether [the inmate] remains a security risk."459 U.S. at 477 n.9. These reviews are necessary to ensure that prison officials are not using "administrative segregation ... as a pretext for indefinite confinement of an inmate." *Id.* The Second Circuit has observed that periodic reviews of an inmate's placement in administrative segregation are "flexible and may be based on 'a wide range of administrative considerations,'" including observations of the inmate

in administrative segregation, knowledge about prison conditions, misconduct charges, ongoing tensions in the prison, and any ongoing investigations. *Proctor*, 846 F.3d at 609 (quoting *Hewitt*, 459 U.S. at 477 n.9).

Baltas has sufficiently alleged plausibly procedural due process claims for lack of periodic review against Director Maiga and Deputy Commissioner Rinaldi.

### D.     Conditions of Confinement[7]

In his fourth and fifth causes of action, Baltas alleges that he was subjected to unconstitutional conditions of confinement.

The Supreme Court has held that an inmate's conditions of confinement may be "restrictive or even harsh" but may "not involve the wanton and unnecessary infliction of pain" or violate "contemporary standard[s] of decency." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981) (citation omitted). To state a claim of deliberate indifference to health or safety due to unconstitutional conditions of confinement, an inmate must demonstrate both an objective and a subjective element. To meet the objective element, the inmate must allege that he was incarcerated under a condition or a combination of conditions that resulted in a "sufficiently serious" deprivation of a life necessity or a "human need[]" or posed "a substantial risk of serious harm" to his health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Rhodes*, 452 U.S. at 347. The Supreme Court has identified the following basic human needs or life necessities of an inmate: food, clothing, shelter, medical care, warmth, safety, sanitary living

---

[7]As Baltas is a sentenced prisoner, his claims of cruel and unusual punishment are reviewed under Eighth rather than Fourteenth Amendment standards. *Wilson v. Seiter,* 501 U.S. 294, 296–97 (1991) (internal citation omitted) ("The Eighth Amendment, which applies to the States through the Due Process Clause of the Fourteenth Amendment, ... prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes.").

conditions, and exercise. *See Wilson*, 501 U.S. at 304; *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989); *Rhodes,* 452 U.S. at 348. To meet the subjective element, an inmate must allege that the defendants possessed culpable intent; that is, the officials knew that he faced a substantial risk to his or her health or safety and disregarded that risk by failing to take corrective action. *See Farmer*, 511 U.S. at 834, 837.

     1.    <u>Isolation/Solitary Confinement</u>

For purposes of initial review, Baltas alleges that he was subjected to a combination of conditions that deprived him of human contact and caused him to remain in his cell for twenty-three or twenty-four hours. For purposes of initial review, these allegations are sufficient to raise a plausible Eighth Amendment violation. *Baltas v. Maiga*, No. 3:20CV1177 (MPS), 2021 WL 2206966, at *9 (D. Conn. June 1, 2021). The Court will permit this Eighth Amendment claim to proceed against Director Maiga, Deputy Warden Jones, and Deputy Commissioner Rinaldi, who were all plausibly deliberately indifferent to Baltas's isolating, restrictive conditions at Garner.

     2.    <u>Programming, Social Mail, Commissary, Visitation, Telephone and Property Restrictions</u>

Baltas's alleges that he suffered from a lack of programs and work opportunities; deprivations concerning his social mail, commissary, visitation, and telephone privileges; and deprivation of his access to personal property. These conditions during his six months of Chronic Discipline status, standing alone, do not suggest a deprivation of a basic human need. *Baltas*, 2021 WL 2206966, at *9 (citing cases finding deprivation of privileges and opportunities for programming do not raise an Eighth Amendment claim); *Baltas v. Erfe*, No. 3:19CV1820 (MPS), 2020 WL 1915017, at *25-26 (D. Conn. Apr. 20, 2020) (dismissing similar claims and citing cases); *Shtilman v. Makram*, No. 14-CV-6589 (NSR), 2018 WL 3745670, at *6 (S.D.N.Y.

Aug. 6, 2018) (concluding that claims about personal property deprivations did not state an Eighth Amendment claim); *Vega v. Rell*, No. 09-CV-0737, 2011 WL 2471295, at *25 (D. Conn. June 21, 2011) ("[i]nmates have no constitutional right to purchase items from the prison commissary"); *Gill v. Mooney*, 824 F.2d 192, 194 (2d Cir. 1987) (finding no constitutional right to a job in the absence of underlying state law mandating jobs for prisoners).[8] These claims are not plausible under Eighth Amendment standards.

    3.   <u>Exercise</u>

    Baltas alleges that he was deprived of exercise during his six month Chronic Discipline status. The Second Circuit has recognized that the Eighth Amendment requires prison inmates to be allowed some out-of-cell exercise. *Williams v. Greifinger*, 97 F.3d 699, 704 n.5 (2d Cir. 1996); *Edwards v. Quiros*, 986 F.3d 187, 195 (2d Cir. 2021) (noting that the right at issue is for "some opportunity to exercise"). However, prison officials may limit the right to out-of-cell exercise "where there is a valid safety exception or certain unusual circumstances." *Williams*, 97 F.3d at 704 (holding that segregated confinement for long periods does not violate Eighth Amendment if inmate is provided opportunity for exercise) (citations omitted). "[N]either an occasional day without exercise when weather conditions preclude outdoor activity nor reliance on running, calisthenics, and isometric and aerobic exercises in lieu of games is cruel and unusual punishment." *Anderson v. Coughlin*, 757 F.2d 33, 36 (2d Cir. 1985). However, a

---

[8] Baltas's claim concerning inability to engage in religious services and practices is governed by the First rather than the Eighth Amendment. *See Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 842 (1998) (quotation marks omitted). Moreover, Baltas's inability to participate in a religious practice does not constitute the deprivation of a basic human need or life necessity. *See Rhodes*, 452 U.S. at 347 (To satisfy the objective component of an Eighth Amendment claim, a prisoner must demonstrate that his or her conditions of confinement alone or in combination resulted in "unquestioned and serious deprivations of basic human needs" or "deprive[d] [him or her] of the minimal civilized measures of life's necessities."). This claim must be dismissed as not plausible.

plausible Eighth Amendment deprivation may arise where a defendant fails to assure an inmate "the opportunity for meaningful daily outdoor exercise." *McCray v. Lee*, 963 F.3d 110, 118 (2d Cir. 2020) (plaintiff was "denied any meaningful exercise opportunity for four months" because Defendants "refus[ed] to have ice and snow cleared away, leaving more than 75 percent of yard space with snow and ice at waist height[.]"). Here, Baltas's allegations are sufficient to raise a plausible Eighth Amendment claim against Director Maiga, Deputy Warden Jones, and Deputy Commissioner Rinaldi, who plausibly were plausibly deliberately indifferent to the allegedly unconstitutional limitations on Baltas's opportunity for exercise.

4.    Access to Reading and Writing Materials

Baltas complains that he did not have access to reading and writing materials. However, the denial of reading and writing materials does state a claim that he was deprived of a life necessity. *See Baltas v. Erfe,* 2020 WL 1915017, at \*27 (D. Conn. Apr. 20, 2020).[9]

5.    Hygiene

---

[9] Nor does Baltas allege a plausible clam that his deprivation of these materials interfered with his access to the courts. It is well settled that inmates have a First Amendment "right of access to the courts." *Bounds v. Smith*, 430 U.S. 817, 828 (1977), *modified on other grounds, Lewis v. Casey*, 518 U.S. 343, 350 (1996). The "right of access to the courts" requires States "to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Bounds*, 430 U.S. at 825. To state a claim for denial of access to the courts, an inmate is required to demonstrate that he suffered an actual injury as a result of the conduct of the defendants. *Lewis*, 518 U.S. at 351-53. To establish an actual injury, an inmate must allege facts showing that the defendant took or was responsible for actions that hindered his efforts to pursue a "nonfrivolous" legal claim. *Christopher v. Harbury*, 536 U.S. 403, 414–15 (2002) ("Whether access claim turns on a litigating opportunity yet to be gained or an opportunity already lost  . . . plaintiff  must identify a 'nonfrivolous,' 'arguable' underlying claim" that he sought to pursue or seeks to pursue in court) (quoting *Lewis*, 518 U.S. at 353 & n.3)). Baltas asserts no allegations related to any interference with his attempt to pursue a legal claim or file a lawsuit during his six month Chronic Discipline status.

Baltas alleges that he was deprived of an ability to shave and care for his nails; and access to soap other than a medicine cup of liquid soap, tooth paste, and cleaning supplies. He also asserts that he was permitted only three showers per week.

Inmates have a right to sanitary living conditions and the necessary materials to maintain adequate personal hygiene. *See Walker v. Schult,* 717 F.3d 119, 127 (2d Cir. 2013) (citing cases for the proposition that "the failure to provide prisoners with toiletries and other hygienic materials may rise to the level of a constitutional violation"); *see also Townsend v. Sweet*, No. 3:19-cv-580(SRU), 2019 WL 4139469, at *7 (D. Conn. Aug. 30, 2019) (permitting Eighth Amendment conditions claim based on denial of hygiene items and clean clothing for several days to proceed on initial review); *Atkins v. County of Orange*, 372 F. Supp. 2d 377, 406 (S.D.N.Y. 2005) ("The failure to regularly provide prisoners with ... toilet articles including soap, razors, combs, toothpaste, [and] toilet paper ... constitutes a denial of personal hygiene and sanitary living conditions."); *but see Conley v. Aldi*, No. 3:18-cv-824(VAB), 2020 WL 1333501, at *5 (D. Conn. Mar. 23, 2020) (holding that inability to "practice" personal hygiene for a three-day period and a four-day period failed to state Eighth Amendment violation and noting that occasional or temporary denials of hygiene items does not constitute deprivation of basis human need).

For purposes of initial review, the Court concludes that Baltas has stated a deprivation of his basic human need to maintain personal hygiene and sanitary cell conditions. The Court will permit this claim to proceed against Director Maiga, Deputy Warden Jones, and Deputy Commissioner Rinaldi, who were plausibly deliberately indifferent to Baltas's inability to maintain hygienic personal care and sanitary cell conditions.

19

However, Baltas' alleged allegations that he was permitted only three showers per week does not suggest a deprivation of a basic human need. *See Bernier v. Sweet*, No. 15-CV-209 (RJA) (HBS), 2018 WL 1047103, at *3 (W.D.N.Y. Feb. 26, 2018) (normal conditions of segregation permitting only two showers per week did not constitute sufficient deprivation under Eighth Amendment).

      6.     Use of Out-of-Cell Restraints

Baltas alleges that he was subjected to moving outside of his cell while restrained at all times.

"Restraints on an inmate do not violate the [eighth] amendment unless they are totally without penological justification, grossly disproportionate, or involve the unnecessary and wanton infliction of pain." *Smith v. Coughlin*, 748 F.2d 783, 787 (2d Cir. 1984) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 346, (1980) (internal quotations omitted). In an Eighth Amendment claim based on the use of restraints, the court should "consider whether the use of restraints was reasonably calculated to restore prison discipline and security and, in that purposive context, whether the officials were deliberately indifferent to [Plaintiff's] health and safety." *Trammell v. Keane*, 338 F.3d 155, 163 (2d Cir. 2003). At this early stage in the proceeding, the Court cannot determine whether the alleged use of restraints was justified for Baltas; therefore, the Court construes Baltas's allegations concerning the use of restraints to raise a plausible risk of harm to his health and well-being. This claim may proceed against Director Maiga, Deputy Warden Jones, and Deputy Commissioner Rinaldi for further development.

      7.     Requirement to Strip Naked Prior to Exiting Cell

Baltas alleges as a condition of confinement that he was required to strip naked prior to exiting his cell. This allegation raises concerns about violation of Baltas's Fourth Amendment right to bodily privacy. *See Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016) (*per curiam*) (citing *Covino v. Patrissi*, 967 F.2d 73, 78 (2d Cir. 1992)). The Second Circuit has articulated a two-part test to determine whether a correctional officer has violated a prisoner's right to personal bodily privacy. "First, the court must determine whether the inmate has exhibited an actual, subjective expectation of bodily privacy; and [ ] second, the court must determine whether the prison officials had sufficient justification to intrude on the inmate's fourth amendment rights." *Harris*, 818 F.3d at 57; s*ee Covino*, 967 F.2d at 77 (appropriate inquiry is whether the prisoner "has exhibited a subjective expectation of privacy and whether society is prepared to recognize that expectation of privacy as reasonable").

Here, Baltas's allegations raise an inference that his Fourth Amendment right to personal bodily privacy was violated by the policy or practice of requiring him to strip upon exiting his cell. For purposes of initial review, the Court assumes that Director Maiga, Deputy Warden Jones, and Deputy Commissioner Rinaldi created the policy or practice or allowed the continuance of such. At least one district court within this Circuit has held that even after *Tangreti*, a supervisory prison official can still be held liable for his or her role in creating or permitting a policy by which a constitutional violation occurs. *See Stone #1 v. Annucci*, No. 20-CV-1326 (RA), 2021 WL 4463033, at *8 (S.D.N.Y. Sept. 28, 2021) ("Although the Second Circuit generally rejected *Colon*, *Tangreti* does not suggest that *Colon*'s third factor—whereby a defendant can be said to be personally involved in a constitutional violation if he 'created a policy or custom under which unconstitutional practices occurred, or allowed the continuance

of such a policy or custom,' —could never form the basis of an official's liability.") (internal

citation omitted). Accordingly, on initial review the Court will permit Baltas's Fourth

Amendment claim to proceed against Director Maiga, Deputy Warden Jones, and Deputy

Commissioner Rinaldi for further development.

E.     **First Amendment Free Exercise**

Baltas alleges that Deputy Commissioner Rinaldi and Deputy Warden Jones denied him

free access to his religious practices and services.

It is well-established that an inmate has a First Amendment right to freely exercise his or

her chosen religion. *See O'Lone v. Estate of Shabazz*, 283 U.S. 342, 348 (1987) ("Inmates clearly

retain protections afforded by the First Amendment, including its directive that no law shall

prohibit the free exercise of religion."). An inmate's First Amendment rights, however, are

"[b]alanced against ... the interests of prison officials charged with complex duties arising from

the administration of the penal system." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003)

(internal quotation marks and citation omitted). Thus, an inmate's right to freely exercise his or

her religion is not without limits and may be subject to restrictions related to legitimate concerns

involving safety and security. *See Pell v. Procunier,* 417 U.S. 817, 822 (1974) (A "prison inmate

retains those First Amendment rights that are not inconsistent with his status as a prisoner or with

the legitimate penological objectives of the corrections system.").

To state a First Amendment free exercise claim, an inmate is required to make a threshold

showing "that the disputed conduct substantially burden[ed] his sincerely held religious beliefs."

*Salahuddin v. Goord*, 467 F.3d 263, 274-75 (2d Cir. 2006).[10] In determining whether an inmate's

---

[10] In the last several years, the Second Circuit has recognized that a question exists as to whether
an inmate must establish that the conduct of prison officials resulted in a "substantial burden" on his

religious beliefs are sincere, a district court should not "evaluate the objective reasonableness of the [inmate's] belief" but consider only whether the [inmate] "sincerely holds a particular belief and whether the belief is religious in nature." *Ford*, 352 F.3d at 590.

If an inmate asserts sufficient facts to state a plausible claim that prison officials engaged in conduct that burdened the free exercise of his or her religious beliefs, those officials then must "identify[] the legitimate penological interests that justif[ied] [their] conduct. *Salahuddin*, 467 F.3d at 275 (citations omitted). "The burden remains with the [inmate] to show that" the concerns articulated by the prison officials are "irrational." *Id.* (internal quotations omitted).

"The exercise of religion often involves not only belief and profession but the performance of physical acts such as assembling with others for a worship service or participating in sacramental use of bread and wine." *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005) (internal citation omitted); *Goode v. Bruno*, No. 3:10CV1734 (SRU), 2013 WL 5448442, *6 (D. Conn. Sept. 30, 2013) ("Plaintiff identifies the right at issue as his First Amendment right to possess objects, participate in ceremonies and observe holidays that are part of his sincerely held religious beliefs and necessary to practice his religion."). For initial pleading purposes, the Court concludes that Baltas has stated a plausible claim that Deputy Warden Jones and Deputy

---

religious beliefs in order to state a First Amendment free exercise claim. *See Brandon v. Kinter*, 938 F.3d 21, 32 n.7 (2d Cir. 2019) ("Our Circuit has not yet decided whether the substantial burden requirement remains good law after the Supreme Court's decision in *Employment Division v. Smith*. . . ."); *Holland v. Goord*, 758 F.3d 215, 220 (2d Cir. 2014) ("It has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a 'prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs.'") (quoting *Salahuddin,* 467 F.3d at 274–75 and citing *Ford,* 352 F.3d at 592 (assuming without deciding that substantial burden requirement applies)). Because the issue has not yet been squarely addressed by the Second Circuit, this court will continue to apply the substantial burden test. *See Richard v. Strom*, No. 3:18-CV-1451 (CSH), 2018 WL 6050898, at *3 (D. Conn. Nov. 19, 2018) (noting the "Second Circuit['s] uncertainty" as to whether an inmate must continue to make a "threshold showing" that the conduct of the prison official substantially burdened his or her religious beliefs, but observing that "absent instruction to the contrary, Second Circuit courts have continued to assume the validity of the substantial burden test when

Commissioner Rinaldi unconstitutionally and substantially burdened his right to free exercise of his sincerely held religious practices by failing to provide him access to such practices after he informed them of his religious deprivation.

Accordingly, the First Amendment Free Exercise Clause claim may proceed against Deputy Warden Jones and Deputy Commissioner Rinaldi for further development.

### F.    Fourteenth Amendment Equal Protection

Baltas's alleges an inability to smudge while other Native American-designated inmates were able to smudge. Compl. at ¶ 64.

The Equal Protection Clause requires that the government treat all similarly situated people alike." *Harlen Assocs. v. Inc. Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001). To state an equal claim, a plaintiff must allege facts showing that: (1) he was treated differently from similarly situated individuals and (2) that the selective treatment was motivated by an intention to discriminate on the basis of "impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000) (citations omitted).

When a suspect classification is not at issue, the equal protection guarantee still "extends to individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials." *Williams v. Novoa*, No. 19-CV-11545 (PMH), 2021 WL 431445, at *9 (S.D.N.Y. Feb. 5, 2021); *see also Fortress Bible Church v. Feiner,* 694 F.3d 208, 222 (2d Cir. 2012). In such cases, a plaintiff may proceed with an equal protection claim under a theory of non-class based selective enforcement or a "class of one." *Hu*

addressing free exercise claims") (citations omitted).24

*v. City of New York*, 927 F.3d 81, 93 (2d Cir. 2019) (noting selective enforcement and "class of one" provide distinct pathways for non-class based equal protection claims).

A plaintiff may bring a "class of one" equal protection claim by alleging that he or she "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). In the Second Circuit, a class-of-one plaintiff "must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Clubside v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) (citation omitted). The similarity between the plaintiff and comparators provides "an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose—whether personal or otherwise—is all but certain." *Witt v. Village of Mamaroneck*, No. 12-CV-8778 (ER), 2015 WL 1427206, at *5 (S.D.N.Y. Mar. 27, 2015), *aff'd*, 639 F. App'x 44 (2d Cir. 2016) (quoting *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005)).

For either a non-class based selective enforcement or a class of one claim, the plaintiff must allege he was treated differently than comparator to raise an equal protection. *Hu*, 927 F.3d at 93 (2d Cir. 2019) ("both types of Equal Protection claims require a showing that the plaintiff was treated differently from another similarly situated comparator"). However, a selective enforcement claim only requires a plaintiff to show that a comparator of a "reasonably close resemblance" was treated differently. *Id.* (noting that malice-based selective enforcement claims require only a "reasonably close resemblance" between a plaintiff and comparator).

For initial pleading purposes only, Baltas has sufficiently alleged that he was treated differently than other Native American-designated inmates at Garner who plausibly constitute comparators for his equal protection claims. The Court will permit Baltas's equal protection claims under a selective enforcement and/or class of one theory to proceed for development against Deputy Warden Jones and Deputy Commissioner Rinaldi.

### G.     Fifth Amendment

Baltas references violation of his Fifth Amendment rights. Compl. at ¶ 83.To the extent that Baltas asserts a claim that the defendants violated his right to due process under the Fifth Amendment, such claim is not plausible. The Due Process Clause of the Fifth Amendment applies only to actions by the United States government and federal employees. *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002) (holding that the Fifth Amendment's due process clause only protects citizens against the conduct of federal government officials, not state officials). Baltas is not suing federal officials.

Accordingly, all Fifth Amendment claims are dismissed as not plausible.

### H.     Violation of Criminal Statutes

Baltas asserts that defendants have engaged in a pattern of corruption and fraud including forgery, fraud, falsifying state documents and state records in violation of criminal statutes. Baltas does not, however, specify what criminal statutes he claims have been violated. It is well-settled that, unless specifically provided for, federal criminal statutes do not create private rights of action. *See Chrysler Corp. v. Brown,* 441 U.S. 281, 316 (1979). Similarly, the Connecticut Supreme Court has held that, unless private enforcement is expressly stated in a statute, there is a presumption in Connecticut that private enforcement does not exist. *See Provencher v. Town of*

*Enfield*, 284 Conn. 772, 777 (2007). The burden is on the plaintiff to overcome that presumption

and show that the statute creates an implied right of action. *Id.* at 777–78; *see Ward v.*

*Housatonic Area Regional Trans. Dist.*, 154 F. Supp. 2d 339, 358–59 (D. Conn. 2001) (no

private right of action under Connecticut criminal statute when there was "no

private cause of action contemplated by" it). Baltas's allegations do not indicate that he has a

private cause of action under a criminal statute. These claims must be dismissed as not plausible.

### I.       RICO Violation

Baltas asserts that Defendants have "engaged in a pattern of corruption and fraud" in

violation of "federal RICO laws." Compl. at ¶ 85.

Congress enacted RICO to address the unlawful activities of those individuals involved in

organized crime in in the United States. *See Att'y Gen. of Can. v. R.J. Reynolds Tobacco*

*Holdings, Inc.,* 268 F.3d 103, 107 (2d Cir. 2001) ("RICO is a broadly worded statute that has as

its purpose the elimination of the infiltration of organized crime and racketeering into legitimate

organizations operating in interstate commerce.") (internal quotation marks omitted). RICO is

directed at " 'racketeering activity,' which i[s] define[d] as any act 'chargeable' under several

generically described state criminal laws, any act 'indictable' under numerous specific federal

criminal provisions, and any 'offense' involving bankruptcy or securities fraud or drug-related

activities that is 'punishable' under federal law." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479,

482-83 (1985) (quoting 18 U.S.C. § 1961(1)).

"To state a claim for damages under RICO, a plaintiff has two pleading burdens." *Town*

*of W. Hartford v. Operation Rescue*, 915 F.2d 92, 100 (2d Cir. 1990) (quotation and citation

omitted). First, he must allege that a defendant violated 18 U.S.C. § 1962. *Id.* Thus, a plaintiff

must allege "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Id.* Second, a plaintiff must also allege that he was "'injured in his business or property by reason of a violation of section 1962.'" *Id.* (quoting 18 U.S.C. § 1964(c)); *Sentementes v. Town of Bethel*, No. 3:20CV580 (MPS), 2020 WL 5994950, at *12 (D. Conn. Oct. 9, 2020).

Baltas makes a conclusory assertion that Defendants have violated the RICO statute, but his factual allegations fail to plausibly allege the elements of a civil RICO claim. He has not alleged facts reflecting that Defendants have engaged in a pattern of racketeering activity; even if he has, Baltas has not alleged facts reflecting that a violation of section 1962 has injured him "in his business or property." Accordingly, Baltas's claims under RICO must be dismissed as not plausible.

### J.      Request for Investigation

Baltas requests referral for the Connecticut State's Attorney Office to conduct investigations into, and/or prosecution for, the criminal misconduct alleged in his complaint. However, Baltas has no "constitutional right to an investigation of any kind by government officials[,]" *Banks v. Annucci*, 48 F. Supp. 3d 394, 414 (N.D.N.Y. 2014) (citations omitted); s*ee also Leeke v. Timmerman*, 454 U.S. 83, 87 (1981) (inmates alleging beating by prison guards lack standing to challenge prison officials' request to magistrate not to issue arrest warrants); *Linda R. S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("in American jurisprudence at least, a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution

of another"); *Joyce v. Hanney*, No. 3:05cv1477 (WWE), 2009 WL 563633, at *9 (D. Conn. Mar. 4, 2009) (prisoner has no constitutional right to have defendants disciplined or prosecuted). Accordingly, this request is dismissed as not plausible.[11]

## ORDERS

In accordance with the foregoing analysis, the court enters the following orders:

(1) The case shall proceed on the following individual capacity claims:  Baltas's Fourteenth Amendment procedural due process claims against Director Maiga, Deputy Warden Jones, Hearing Officer Calderon, and Deputy Commissioner Rinaldi arising from his Chronic Discipline placement; his Fourteenth Amendment procedural due process claims against Director Maiga and Deputy Commissioner Rinaldi based on the lack of periodic reviews; his Eighth Amendment conditions of confinement claims against Director Maiga, Deputy Warden Jones, and Deputy Commissioner Rinaldi; his Fourth Amendment claims against Director Maiga, Deputy Warden Jones, and Deputy Commissioner Rinaldi; his First Amendment free exercise claims against Deputy Commissioner Rinaldi and Deputy Warden Jones; and his Fourteenth Amendment equal protection claims based on his inability to smudge against Deputy Warden Jones and Deputy Commissioner Rinaldi.

All other claims are DISMISSED without prejudice.

(2) The Clerk shall verify the current work address of Director David Maiga, Deputy Warden Kim Jones, Deputy Commissioner Monica Rinaldi with the DOC Office of Legal

---

[11] In *Ex parte Young*, 209 U.S. 123, 155-56 (1908), the United States Supreme Court recognized a limited exception to the Eleventh Amendment's grant of sovereign immunity from suit to permit a plaintiff to sue a state official acting in an official capacity for prospective injunctive relief for continuing violations of federal law. *Id.* at 155–56; *In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 371 (2d Cir. 2005). Baltas has alleged constitutional claims based on past conduct and cannot, therefore, seek injunctive relief against the defendants in their official capacities.

Affairs, mail a waiver of service of process request packet containing the complaint, [ECF No. 1], to them at their confirmed addresses within twenty-one (21) days of this Order, and report on the status of the waiver request on the thirty-fifth (35th) day after mailing. If a defendant fails to return the waiver request, the clerk shall make arrangements for in-person individual capacity service by the U.S. Marshals Service on that defendant, and the defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(3) The clerk shall send a courtesy copy of the Complaint, [ECF No. 1], and this Order to the DOC Office of Legal Affairs and to the Connecticut Attorney General.

(4) The defendants shall file a response to the complaint, either an answer or motion to dismiss, within sixty (60) days from the date the notice of lawsuit and waiver of service of summons forms are mailed to him. If the defendants choose to file an answer, defendants shall admit or deny the allegations and respond to the cognizable claims recited above. The defendants may also include any and all additional defenses permitted by the Federal Rules.

(5) Discovery, according to Federal Rules of Civil Procedure 26-37, shall be completed within six months (180 days) from the date of this Order. Discovery requests need not be filed with the Court.

(6) The parties must comply with the District of Connecticut "Standing Order Re: Initial Discovery Disclosures," which will be sent to both parties by the Court. The Order can also be found at http://ctd.uscourts.gov/administrative-standing-orders.

(7) All motions for summary judgment shall be filed within seven months (210 days) from the date of this Order.

(8) According to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within twenty-one (21) days of the date the motion was filed. If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(9) If the plaintiff changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that he MUST notify the Court. Failure to do so can result in the dismissal of the case. The plaintiff must give notice of a new address even if he is incarcerated. He should write "PLEASE NOTE MY NEW ADDRESS" on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If the plaintiff has more than one pending case, he should indicate all of the case numbers in the notification of change of address. He should also notify the defendants or defense counsel of his new address.

(10) The plaintiff shall utilize the Prisoner Efiling Program when filing documents with the court. The plaintiff is advised that the Program may be used only to file documents with the court. Local court rules provide that discovery requests are not filed with the court. D. Conn. L. Civ. R. 5(f). Therefore, discovery requests must be served on defense counsel by regular mail.

SO ORDERED at Hartford, Connecticut this 27th day of December, 2021.


                                                         /s/
                                               Michael P. Shea, U.S.D.J.