## UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOE BALTAS, | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:21cv469 (MPS) |
| v. | : | |
| KIM JONES, MICHAEL CALDERON, | : | |
| DAVID MAIGA, and MONICA | : | |
| RINALDI, in their individual capacities, | : | |
| Defendants. | : | |

## MEMORANDUM OF DECISION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The plaintiff, Joe Baltas, is a sentenced prisoner incarcerated in the custody of the Department of Correction ("DOC"). He filed this civil rights action under 42 U.S.C. § 1983 against Deputy Warden Kim Jones, Correctional Counselor Michael Calderon, Deputy Commissioner Monica Rinaldi, and Director of the Office of Classification and Population Management ("OCPM") David Maiga in connection with his confinement at Garner Correctional Institution ("Garner") in 2018. *See* Compl., ECF No. 1.

After initial review, the Court permitted Plaintiff to proceed on the following claims for damages: (1) Fourteenth Amendment procedural due process violation against Director Maiga, Deputy Warden Jones, Hearing Officer Calderon, and Deputy Commissioner Rinaldi arising from his Chronic Discipline placement; (2) Fourteenth Amendment procedural due process violation against Director Maiga and Deputy Commissioner Rinaldi based on his lack of periodic reviews; (3) Eighth Amendment violation based on his conditions of confinement against Director Maiga, Deputy Warden Jones, and Deputy Commissioner Rinaldi; (4) Fourth Amendment violation against Director Maiga, Deputy Warden Jones, and Deputy Commissioner Rinaldi; (5) First Amendment Free Exercise Clause violation against Deputy Commissioner

Rinaldi and Deputy Warden Jones; and (6) Fourteenth Amendment Equal Protection Clause violation against Deputy Warden Jones and Deputy Commissioner Rinaldi. Initial Review Order, ECF No. 30.

On October 18, 2022, Defendants filed a motion for summary judgment on the complaint in its entirety. Mot. for Summ. Judg., ECF No. 59.

On January 20, 2022, Plaintiff filed his opposition to Defendant's motion for summary judgment. Pl. Obj., ECF No. 74, Pl. Opp. ECF No. 76.

On February 24, 2023, the Court terminated all pending motions without prejudice due to pending settlement negotiations. Order, ECF No. 85. After the settlement negotiations failed, the Court reopened Defendants' motion for summary judgment and instructed Defendants to file their reply to Plaintiff's opposition. Order, ECF No. 100. After Defendants filed their reply (ECF No. 105), Plaintiff was permitted Plaintiff to file a sur-reply. Pl. sur-reply, ECF No. 109.[1]

## I.     FACTUAL BACKGROUND

The following factual background reflects the Court's review of complaint,[2] the Local Rule 56(a) statements of facts, and all supporting materials. *See* Compl., ECF No. 1; Defs. Rule

---

[1] Plaintiff makes a meritless claim that Defendants' motion for summary judgment is procedurally improper under Federal Rule of Civil Procedure 7 for failure to "state with particularity the grounds for seeking the order." Pl. Obj. at 1. Defendants' brief leaves no doubt about the grounds for the motion. Plaintiff also complains that the motion for summary judgment exceeds page length requirements stated in this District's Local Rule 7.  But Plaintiff is hardly in a position to fault Defendants for noncompliance with this Court's space and formatting rules, because his own brief in this case uses spacing of 1.5 (or less), rather than the double spacing required by the Court's rules, enabling Plaintiff to circumvent the page limits. *Compare* ECF No. 76 at 43 (page of Plaintiff's brief consisting of 37 lines); *with* ECF No. 59-1 at 4 (page of Defendants' brief consisting of 19 lines); *see* D. Conn. L.R. 7(a)(5).

[2] *See Jordan v. LaFrance*, No. 3:18-cv-01541 (MPS), 2019 WL 5064692, at *1 n.1, *4 (D. Conn. Oct. 9, 2019) (a "verified complaint . . . may be considered as an affidavit" for summary judgment purposes"); *Walcott v. Connaughton*, No. 3:17-CV-1150, 2018 WL 6624195, at *1, n. 1 (D. Conn. Dec. 18, 2018).

56(a)1, ECF No. 59-2; Pl. Rule 56(a)2, ECF No. 78. All facts are undisputed unless otherwise indicated.[3]

In 2018, Monica Rinaldi served as the DOC Deputy Commissioner of Operations; David Maiga served as DOC's Director of OCPM; Kim Jones served as the Garner Deputy Warden for Treatment and Programs; and Michael Calderon worked for as a Garner Counselor Supervisor. *Id.* at ¶¶ 2-4.

Plaintiff transferred to Garner on November 1, 2017. *Id.* at ¶ 6. By the end of March 2018, Plaintiff had received at least five Class A disciplinary reports within less than 180 days for security tampering, interfering with safety and security, threats, and public indecency. *Id.* at ¶¶ 7-8. Plaintiff transferred out of Garner on June 6, 2018. *Id.* at ¶ 81.

**Chronic Discipline Determination**

The relevant version of DOC Administrative Directive 9.4 provided for "automatic consideration" for Chronic Discipline, a restrictive housing status, after an inmate received "three (3) or more Class A disciplinary offenses within 180 days." *Id.* at ¶¶ 9-10; Defs. Ex. I, A.D. 9.4(3)(H) & (10), ECF No. 59-12.[4] In light of Plaintiff's disciplinary record, Deputy Warden Jones instructed Garner staff to begin the review and hearing process for Plaintiff's

---

[3] Defendants provided Plaintiff a notice in compliance with Local Rule of Civil Procedure 56(b) that informed him of the requirements for filing his papers in opposition to the motion for summary judgment under Local Rule 56. Notice to *Pro Se Litigant*, ECF No. 59-3. Local Rule 56(a)1 provides: "Each material fact set forth in the Local Rule 56(a)1 Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)2 Statement required to be filed and served by the opposing party in accordance with this Local Rule, or the Court sustains an objection to the fact." Local Rule 56(a)3 provides that "each denial in an opponent's Local 56(a)2 Statement[] must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial." Thus, to the extent a non-movant's Local Rule 56(a)2 statement does not comply Local Rule 56(a), the Court may consider the moving party's statement of fact to be true if supported by the evidence.

[4] Defendants have submitted the version of Administrative Directive 9.4 effective during the period relevant to this action as Exhibit I.

possible placement on Chronic Discipline status. Defs. Rule 56(a)1 at ¶ 12. In April 2018, Calderon received notification that Plaintiff should be scheduled for a hearing to be considered for a Chronic Discipline placement. *Id.* at ¶ 13.

On April 10, 2018, Plaintiff received a notice form (CN 9402) for his Chronic Discipline hearing scheduled for April 11, 2018 due to his five class A disciplinary offenses within 180 days. *Id.* at ¶ 15; *see* Calderon Decl. at 21 (Notice), ECF No. 59-7. The Notice form reflects that Plaintiff refused to sign it and declined an advisor. *Id.*

Defendant Calderon met with Plaintiff on April 11, 2018. Defs. Rule 56(a)1 at ¶ 16. Calderone avers that Plaintiff communicated that he did not require an advisor and signed a form (CN 9403) to waive 48-hour notice of his hearing. Defs. Ex. D, Calderone Decl. at ¶¶ 12-15; *id.* at 22 (Waiver).[5]

Calderon declares that he later presided at Plaintiff's Chronic Discipline hearing, where he advised Plaintiff that he was being considered for Chronic Discipline due to his receipt of more than three Class A offenses within the last 180 days. *Id.* at ¶¶ 16-18. Calderone avers that Plaintiff provided his statement about why he should not be placed on Chronic Discipline status, which Calderone recorded on the Chronic Discipline hearing report. *Id.* at ¶ 19.[6] The "Inmate Statement" section of the Chronic Discipline Hearing Report states:

> "I'm not a problem, its people messing with me. I was not a problem in the housing unit. Look at the tickets that I have that were thrown out." Inmate Baltas produced Disciplinary Reports that were processed failures. Concerning the D/R Security Tampering, Baltas stated "I did not mess with the door, no way[.] How is that possible,

---

[5] Plaintiff claims he did not sign the waiver, but the form appears to show his signature. *See* Defs. Ex. D, Calderon Decl. at 22 (Waiver).

[6] Plaintiff denies these averments. Pl. Rule 56(a)2 at ¶¶ 17-19.

it's the same with them leaving my cell door unlock[ed] like they did, trying to set me up." Concerning the D/R: Interfering with Safety and security, Baltas stated "The maintenance officer came into my cell with a screwdriver and I told him to get out. That's a safety and security issue." ["]I should not get Chronic, its staff messing with me. I just want to be left alone."

*Id.* at 9.

On April 12, 2018, Calderon recommended a Chronic Discipline placement for Plaintiff, citing his disciplinary history, including his five Class A disciplinary offenses within a 180-day period. *Id.* at 10.

DOC's Director of OCPM retained the discretion to determine Plaintiff's Chronic Discipline status based on Hearing Officer Calderon's recommendation and the hearing records. Defs. Rule 56(a)1 at ¶ 14. And on April 20, 2018, the recommendation for Plaintiff's Chronic Discipline placement was approved after review by OCPM. *Id.* Director Maiga avers that another OCPM staff member signed his name with his express permission. Defs. Ex. B, Maiga Decl. at ¶¶ 8-9, ECF No. 59-5.

Plaintiff appealed his Chronic Discipline status placement. Defs. Rule 56(a)1 at ¶ 27. Deputy Commissioner Rinaldi denied Plaintiff's Grievance Appeal, stating that Plaintiff met the criteria for Chronic Discipline placement under Directive 9.4. *Id.* at ¶ 28; Defs. Ex. G, Guaman Decl. at 29 (Chronic Discipline Appeal), ECF No. 59-10.

Calderone avers, and Plaintiff denies, that Plaintiff received notification of his Chronic Discipline status on May 2, 2018. Defs. Ex. D, Calderone Decl. at ¶ 22; Pl. Rule 56(a)2 at ¶ 30. The Restrictive Status Notification of Decision form (CN 9405) dated May 2, 2018 indicates that Plaintiff refused to sign the form on that date. Defs. Ex. D, Calderone Decl. at 12, (Restrictive Status Notification).

**Placement in Garner RHU and Disciplinary Actions from April 20 to June 6, 2018**

After his Chronic Discipline determination, Plaintiff remained housed at the Garner RHU from April 20 until his transfer out of Garner on June 6, 2018. Defs. Rule 56(a)1 at ¶ 35; *see* Defs. Ex. E, Hurdle Decl. at ¶¶ 8, 11, ECF No. 59-8. Captain George Hurdle was the unit manager of Garner's RHU. Defs. Rule 56(a)1 at ¶ 32. In his declaration, Captain Hurdle avers that Plaintiff's demonstrated willingness to interfere with safe and orderly prison facility operations presented a risk to the safety and security of other inmates and facility staff. Defs. Ex. E, Hurdle Decl. at ¶ 10.

Chronic Discipline inmates at Garner were initially housed in the RHU and then transitioned back to general population. Defs. Rule 56(a)1 at ¶ 35.

While he was on Chronic Discipline status, Plaintiff was also placed on Administrative Detention and Punitive Segregation. *See Id.* at ¶¶ 36-39. On May 15, 2018, Plaintiff received a disciplinary report for public indecency, which resulted in his Administrative Detention status pending resolution of the disciplinary charges. *Id.* at ¶ 36. On May 25, 2018, Plaintiff received another disciplinary report for interfering with safety and security and was on Administrative Detention until resolution of this charge. *Id.* at ¶ 38.

On May 31, 2018, Plaintiff was found guilty of public indecency and received fifteen days of Punitive Segregation, although some of his Administrative Detention time converted to satisfy his Punitive Segregation. *Id.* at ¶ 37.

Captain Hurdle avers that, after Plaintiff transferred out of Garner on June 6, 2018, Plaintiff received a hearing on his May 25, 2018 disciplinary charges for interfering with safety and security, *id.* at ¶ 39, but Plaintiff denies this, ECF No. 78-2 at ¶ 29.

**Garner RHU Conditions**

On Chronic Discipline status, Plaintiff was permitted to attend recreation outside of his cell for one hour per day, five days a week. Defs. Rule 56(a)1 at ¶ 45. Plaintiff claims that his recreation hour was spent "in a small cage identical to a dog kennel," "where he was left in restrains." ECF No. 78 at ¶ 45.

According to Captain Hurdle, RHU inmates were permitted to keep personal hygiene products, such as deodorant and soap, in their cells. Defs. Ex. E, Hurdle Decl. at ¶ 22. Inmates were issued a foam oral hygiene stick rather than a full sized toothbrush. Defs. Rule 56(a)1 at ¶ 49. Inmates were regularly issued disposable sticks along with a cup of toothpaste for use in brushing their teeth daily, and could be provided a replacement after alerting staff if necessary. Defs. Ex. E, Hurdle Decl. at ¶¶ 22-23. He explains that a full sized toothbrush can be fashioned into a weapon. *Id.*

RHU inmates were not permitted to keep razors or nail clippers in their cells. Defs. Rule 56(a)1 at ¶¶ 51, 53. Captain Hurdle avers that inmates were permitted to enter a designated cell and shave with a razor, and that they could clip their nails under the supervision of medical staff. Defs. Ex. E, Hurdle Decl. at ¶¶ 24-25.

Inmates had time to clean their own cells weekly on a designated cleanup day. Defs. Rule 56(a)1 at ¶ 54. Captain Hurdle declares that inmates could request that staff sweep and mop their cells while they attended recreation, and that inmates could use cleaning solutions so long as there were no mental health concerns. Defs. Ex. E, Hurdle Decl. at ¶ 26. Plaintiff represents that staff never swept and mopped an inmate's cell, and that inmates never received cleaning solutions. *See* Pl. Rule 56(a)2 at ¶ 54.

7

Captain Hurdle states that staff removed used food trays and associated debris at some point during that meal's shift, but Plaintiff claims staff did not remove trays during the same shift. Defs. Ex. E, Hurdle Decl. at ¶ 26; Pl. Rule 56(a)2 at ¶ 54.

Plaintiff's conditions in the RHU were the same regardless of his status on CD, Administrative Detention, or Punitive Segregation. Defs. Rule 56(a)1 at ¶ 55.

**Use of Out-of-Cell Restraints**

Captain Hurdle states that Plaintiff's placement on Administrative Detention or Punitive Segregation status would have had an impact on the use of restraints during his escorts. Defs. Ex. E, Hurdle Decl. at ¶ 28. He avers that whether Plaintiff was on Chronic Discipline, Administrative Detention, or Punitive Segregation, he would have been placed in restraints only while being escorted outside of his cell. He further avers that Plaintiff would not be restrained in his cell or in a designated recreation area, except after an incident or unruly and disruptive behavior. Defs. Ex. E, Hurdle Decl. at ¶ 33. Plaintiff represents that his out-of-cell restraints remained the same throughout his Garner RHU confinement and that he was routinely left in restraints in the outside recreation cages. *See* Pl. Rule 56(a)2 at ¶¶ 56, 61.

**Periodic Reviews**

Captain Hurdle (as the unit manager and the unit counselor) and other Garner facility staff conducted periodic review of inmates on Chronic Discipline status at Garner in 2018. Defs. Rule 56(a)1 at ¶¶ 42-43. Captain Hurdle represents that Garner RHU staff progressed Plaintiff from Interval I to Interval II of Chronic Discipline on May 20, 2018. Defs. Ex. E, Hurdle Decl. at ¶ 19.

**Religious Exercise**

Chaplain Athey, who currently works as a DOC facility chaplain and is a member of the Mohegan Tribe and a Native American spiritual leader and adviser, oversaw the Native American religious practices and services at DOC facilities in 2018. Defs. Ex. F, Athey Decl. at ¶¶ 3-4, ECF No. 59-9.[7] Chaplain Athey avers that inmates designated as practicing Native American religious beliefs could request participation in smudging—a Native American practice that traditionally involves the burning of herbs—by making a request to the facility's Religious Facilitator and signing the Memorandum of Understanding regarding smudging. *Id.* at ¶¶ 8-9; *id.* at 8-9 (DOC's Memorandum of Understanding and Use Agreement for Individual Smudging). This Memorandum of Understanding was developed in conjunction with Native American chaplains to ensure that DOC inmates can practice their religious beliefs while accommodating prison concerns and safety and security interests. Defs. Rule 56(a)1 at ¶ 77.

Chaplain Athey explains that inmates participating in smudging were generally escorted outside in the morning and afforded approximately 15 minutes to perform the smudging ceremony using a lighter to burn certain herbs. Defs. Ex. F, Athey Decl. at ¶ 10.

Garner RHU inmates on special statuses such as Chronic Discipline or Administrative Segregation, however, were not permitted to participate in any joint worship. Defs. Rule 56(a)1 at ¶ 68; Defs. Ex. F, Athey Decl. at ¶ 12. Captain Hurdle states that inmates in restrictive housing

---

[7]Plaintiff claims that Chaplain Athey had no personal knowledge of the Garner RHU in 2018 and is, therefore, not qualified as declarant about the Garner RHU inmates' access to smudging practices. Pl. Obj. at 1; Pl. Rule 56(a)2 at ¶ 62. Plaintiff provides no evidence to substantiate this assertion except his own averments that he never interacted with Chaplain Athey, and that Chaplain Athey never entered the Garner RHU while Plaintiff was confined there. Pl. Ex. 2, Pl. Decl. at ¶ 47. But Plaintiff's lack of interaction with him does not mean that Chaplain Athey lacks personal knowledge about DOC policies or practices related to Native American religious practices at Garner. Chaplain Athey's declaration avers that he does have such personal knowledge, ECF No. 59-9 at 3 ¶ 4, and Plaintiff has offered no admissible evidence to rebut that averment.

who were considered to present safety and security concerns and practiced Native American religious beliefs were not permitted to engage in the smudging ceremony involving the burning of herbs outside due to security concerns. Defs. Ex. E, Hurdle Decl. at ¶ 35.

Chaplain Athey explains that Garner RHU inmates were offered an alternative form to perform the ceremony (as agreed to by the inmate population as part of the smudging Memorandum of Understanding) known as "dry smudging" in their cells with a ceremonial feather but no burning of herbs. Defs. Ex. F, Athey Decl. at ¶¶ 13-16; *id* at 8-9 (Memorandum of Understanding and Use Agreement for Individual Smudging).[8]

### III.    LEGAL STANDARD

A motion for summary judgment may be granted only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56(a), Fed. R. Civ. P.; *see also Nick's Garage, Inc. v. Progressive Cas. Ins. Co.,* 875 F.3d 107, 113-14 (2d Cir. 2017). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage*, 875 F.3d at 113-14 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the burden of informing the court of the basis for its motion and identifying the admissible evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must set forth specific facts showing that there is a genuine

---

[8] Defendants have submitted copies of the Memorandum of Understanding and Use agreement for Individual Smudging showing Plaintiff's signature in 2014 and 2015; these documents include the relevant "dry smudging" provision still in effect at paragraph six ("A feather for smudging one's self may be a substitute prayer format for inmates who are ineligible or unable to smudge in the traditional manner."). Defs. Ex. F, Athey Decl. at ¶¶ 17, 20; *id.* at 8-9.

issue for trial. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). He cannot "rely on conclusory allegations or unsubstantiated speculation but must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 34 (2d Cir. 2015) (quotation marks and citation omitted). To defeat a motion for summary judgment, the nonmoving party must present such evidence as would allow a jury to find in his favor. *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

Although the court is required to read a self-represented "party's papers liberally and interpret them to raise the strongest arguments that they suggest," *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015), "unsupported allegations do not create a material issue of fact" and do not overcome a properly supported motion for summary judgment. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

## III.    DISCUSSION

Defendants argue that Plaintiff has not exhausted his administrative remedies under the PLRA, that he cannot prevail on the merits of his claims, and that Defendants are entitled to qualified immunity.[9] Defs. Mem., ECF No. 59-1.

After review of the record, the Court grants the motion for summary judgment on the basis of both the merits and qualified immunity.[10]

### A.      Fourteenth Amendment Procedural Due Process: Chronic Discipline Placement

---

[9] Defendants have asserted their entitlement to qualified immunity as an affirmative defense. Ans. at 13, ECF No. 39.

[10] The Court does not address the PLRA exhaustion issue.

In its initial review order, the Court permitted Plaintiff to proceed against Hearing Officer Calderon, Director Maiga, Deputy Warden Jones, and Deputy Commissioner Rinaldi on his claim of Fourteenth Amendment procedural due process violation arising from his Chronic Discipline determination. IRO at 12.

The Court must analyze a claim for a violation of procedural due process by (1) asking whether there exists a liberty or property interest of which a person has been deprived, and (2) if so, whether the procedures followed by the State in making that deprivation were constitutionally sufficient. *See Swarthout v. Cooke*, 562 U.S. 216, 219 (2011).

Defendants do not dispute that Plaintiff had a liberty interest in avoiding the Chronic Discipline designation. Instead, they maintain that he was afforded the process due under the law for placement on Chronic Discipline status. The parties' debate over this claim hinges on whether the Plaintiff's placement on Chronic Discipline status was a disciplinary determination or an administrative determination.

For a deprivation of a liberty interest within the prison setting, the level of procedural protection required depends on the purpose of the determination. *Bolden v. Alston*, 810 F.2d 353, 357 (2d Cir. 1987). For a disciplinary hearing, an inmate is entitled to the protections set forth in *Wolff v. McDonnell,* 418 U.S. 539 (1974). *See Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) ("Although prison inmates necessarily have their liberty severely curtailed while incarcerated, they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as loss of good-time credit or special confinement that imposes an atypical hardship."); *Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999) (per curiam) (concluding that discipline resulting in atypical confinement may not be imposed

12

without procedures enumerated in *Wolff*). "The *Wolff* Court, while holding that full adversary proceedings are not required for disciplinary deprivations of liberty in the prison setting, required written notice, adequate time to prepare a defense, a written statement of the reasons for action taken, and a limited ability to present witnesses and evidence." *Benjamin v. Fraser*, 264 F.3d 175, 190 (2d Cir. 2001) (footnote omitted). Further prison authorities must "provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges," and when a prisoner is held in restrictive housing, "the duty of assistance is greater because the inmate's ability to help himself is reduced." *Eng v. Coughlin*, 858 F.2d 889, 897 (2d Cir. 1988).

By contrast, for a hearing with an administrative purpose, an inmate is entitled only to "some notice of the charges against him and an opportunity to present his views [either orally or in writing] to the prison official charged with deciding" the matter. *Hewitt v. Helms,* 459 U.S. 460, 476 (1983).[11] A written statement from the inmate generally satisfies this requirement, although the hearing officer may permit an oral presentation if he would find it more useful. *Hewitt,* 459 U.S. at 476.

Further, a decision to place an inmate on a restrictive status must be supported by "some evidence" that is reliable. *See Taylor v. Rodriguez*, 238 F.3d 188, 194 (2d Cir. 2001) (concluding that a prisoner facing confinement in close custody must be provided with a meaningful notice of the charge as well as a decision that is supported by "some evidence" that is reliable) (citation omitted); *Muniz v. Cook*, No. 3:20-CV-1533 (MPS), 2021 WL 5919818, at *4 (D. Conn. Dec.

---

[11] In *Hewitt*, the Supreme Court considered what process should be afforded an inmate who had been placed in administrative segregation pending an investigation into a disciplinary charge. *Id.* at 474. The Court explained that it was appropriate to place an inmate in administrative segregation who "represents a security threat" or to "complet[e] . . . an investigation into misconduct charges." *Id.* at 476.

15, 2021) (noting "'Some evidence' really means 'some *reliable* evidence.'") (citing *Elder v. McCarthy*, 967 F.3d 113, 129 (2d Cir. 2020)). However, the final decision for segregation may "'turn[ ] largely on purely subjective evaluations and on predictions of future behavior.'" *Proctor v. LeClaire*, 846 F.3d 597, 609 (2d Cir. 2017) (quoting *Hewitt*, 459 U.S. at 474).

In *Wilkinson v. Austin*, 545 U.S. 209 (2005), the Supreme Court offered further guidance on distinguishing administrative status determinations from the imposition of punishment for specific disciplinary infractions. There, the Court determined that the informal, nonadversary procedures endorsed in *Hewitt* were sufficient to satisfy the Due Process Clause for determinations about whether to place an inmate for non-disciplinary reasons at a "Supermax" prison.  *See id.* at 214-29. The Court reasoned that the more "formal, adversary-type procedures" of *Wolff* are appropriate to protect liberty interests such as an individual's removal from "free society for a specific parole violation" or revocation of "good-time credits for specific, serious misbehavior[,]" while *Hewitt*'s informal, non-adversary procedures should apply to proceedings where "the inquiry draws more on the experience of prison administrators," and the state interest implicates prison safety and security. *Id.* at 228-229. Applying this analysis, the Court concludes that a Chronic Discipline determination is suited for the informal procedures endorsed in *Hewitt* rather than the more formal procedures of *Wolff*.

Under the relevant version of DOC Administrative Directive 9.4, Chronic Discipline is a "special management program" described as a "restrictive housing status that results in management of an inmate whose behavior, while incarcerated, poses a threat to the security and orderly operation of the facility, or a risk to the safety of staff or other inmates due to repetitive disciplinary infractions." ECF No. 59-12, Defs. Ex. I, Administrative Directive 9.4(3)(H) & (10).

This language expressly invokes the state's interest in prison safety and security. It is also primarily prospective, focusing on whether the inmate "poses a threat to the security and orderly operation of the facility, or a risk to the safety of staff of other inmates." *Id.* That inquiry will entail "subjective evaluations" and "predictions of future behavior," *Hewitt*, 459 U.S. at 474, rather than attempts to adjudicate responsibility for specific, past instances of conduct. To be sure, the inquiry will be informed by past "repetitive disciplinary infractions," but the same is true of other status determinations that are subject only to the more modest procedural protections of *Hewitt*, including administrative segregation. *See* ECF No. 59-12 at 2 (Administrative Directive defining administrative segregation as "[p]lacement of an inmate on a restrictive housing status that results in segregation of the inmate whose *behavior* or management factors pose a threat to the security of the facility or a risk to the safety of staff or other inmates . . . ." (emphasis added)).

Chronic Discipline consists of phases, and the goal of the program is for the inmate to complete specific program components and thereby progress through the phases.  ECF No. 59-12 at 8. Chronic Discipline Interval I focuses on the "adjustment of problematic inmate behavior," while Chronic Discipline Interval II aims to "prepare [the] inmate for return to general population[.]" *Id.* at Attachment B. These are matters that "draw[] . . . on the experience of prison administrators." *Wilkinson*, 545 U.S. at 228-29. And while an inmate's assignment to Chronic Discipline status is "dependent upon the seriousness and repetitiveness of" the plaintiff's prior "disciplinary behavior," *id.* at 9.4(10), it does not involve an adjudication of specific instances of that behavior. That much is evident from Plaintiff's brief: he acknowledges that he

received a separate hearing on his disciplinary reports. ECF No. 76 at 22.[12] The determination to place him on Chronic Discipline status was thus distinct from the determinations whether to impose discipline for particular instances of conduct.  *See generally* Admin. Directive 9.5, Code of Penal Discipline, § 16 (setting forth "Process of Events regarding Disciplinary Report Adjudication"). For these reasons, the due process standards of *Hewitt*, rather than those of *Wolff*, apply to Plaintiff's Chronic Discipline status determination.

This conclusion follows other decisions of this Court finding other restrictive housing status determinations for an inmate's Administrative Segregation or Security Risk Group ("SRG") to be administrative—rather than disciplinary—matters. *See Banks v. Michaud*, No. 3:20-cv-326 (JAM), 2020 WL 7188476, at *4 (D. Conn. Dec. 7, 2020) (placement in administrative segregation requires that prisoner be afforded only "some notice of the basis for restrictive terms of confinement and an opportunity to present his views); *Lewis v. Cook*, 2021 WL 4477392, at *11 (applying *Hewitt* to SRG proceeding); *Jusino v. Rinaldi*, 2019 WL 2720763, at *6 (D. Conn. June 27, 2019) (applying *Hewitt* to SRG proceeding).[13]

Plaintiff complains that his Chronic Discipline hearing occurred "less than twenty hours" from the time he received notice of the hearing on April 10, 2018. Pl. Opp. at 20-22. Due process for an administrative determination requires only that an inmate receive "some notice" of the issue, not the 24-hour notice required for a disciplinary hearing. *See Rodriguez v. Cook*, No. 3:20-CV-1902 (CSH), 2022 WL 4104100, at *8 (D. Conn. Sept. 8, 2022) (noting the difference

---

[12] Although he complains that the hearing on the two reports he received in March 2018 took place after the Chronic Discipline process was "precipitated," ECF No. 76 at 22, he cites no specific evidence to support this complaint and does not dispute that he received hearings on the earlier three disciplinary reports before he was placed on Chronic Discipline.

[13] Contrary to Plaintiff's argument, Pl. Opp. at 20, the use of the word "Discipline" in the label does not transform Chronic Discipline status into a form of discipline. If such labeling was dispositive, the DOC could deprive inmates of their right to *Wolff*-compliant hearings in disciplinary proceedings merely by rechristening those proceedings

16

between the notice required under *Hewitt* and *Wolff*).[14] Nor was Plaintiff entitled to an advisor

under the *Hewitt* procedures.

Plaintiff claims that he never submitted a "written statement" to contest his Chronic

Discipline placement. Pl. Opp. at 23. In his declaration, Hearing Officer Calderon avers that

Plaintiff "provided a statement," which he "recorded in the hearing records." Defs. Ex. D,

Calderon Decl. at ¶ 19, ECF No. 59-7. Even if he did not submit a written statement for his

Chronic Discipline status hearing, Plaintiff submits no nonconclusory evidence to suggest that he

did not receive an opportunity to present his views at the Chronic Discipline hearing, which is all

that was required for an administrative decision. *See Simmons v. Sheckler*, No. 3:16-CV-01224

(JCH), 2018 WL 3596748, at *3 (D. Conn. July 26, 2018) (noting "vague, inconsistent, and

unsupported testimony fails to raise a genuine issue of material fact") (citing *Jeffreys v. City of

New York*, 426 F.3d 549, 554 (2d Cir. 2005)); *Sosa v. Sweet*, No. 3:20-CV-382 (SVN), 2023 WL

2712586, at *6 (D. Conn. Mar. 30, 2023) (conclusory evidence contradicted by the record cannot

create genuine issue of fact to defeat summary judgment). At the summary judgment stage,

Plaintiff, as the nonmoving party, "must offer some hard evidence showing that [his] version of

the events is not wholly fanciful." *D'Amico v. City of N.Y.,* 132 F.3d 145, 149 (2d Cir. 1998).

Thus, based on the present record—including the notice form (CN 9402) and the Chronic

Discipline Hearing Report—no reasonable juror could conclude that Plaintiff did not receive the

requisite notice and opportunity to present his views required by *Hewitt. See* Defs' Ex. D,

Calderon Decl. at 9 (Hearing Report), 21 (Notice). Nor could a reasonable juror conclude after

---

"administrative."

[14] Plaintiff argues that he was entitled to 48 hours' notice. Pl.'s Opp. at 21, pointing to language in the directive that so states. *See* ECF No. 59-12 at 8, Directive No. 9.4, § 11(e). But violations of the procedures set forth in an

review of the record that Plaintiff's Chronic Discipline status determination violated due process as arbitrary or not supported by some reliable evidence. *See* Defs. Rule 56(a)1 at ¶¶ 7-8. Plaintiff's ample disciplinary history afforded the prison administrators justification to assess— based on their "subjective evaluations and predictions of future behavior"—that Plaintiff presented management issues warranting Chronic Discipline status. *See Proctor*, 846 F.3d at 609. Thus, the Court must grant the motion for summary judgment in Defendants' favor on Plaintiff's claim that his placement on Chronic Discipline status, including the attendant notice and hearing, violated Fourteenth Amendment procedural due process standards.

Maiga Signature

Plaintiff's due process claim based on the assertedly forged signature of Defendant Maiga is also without merit. Plaintiff claims that the signature is the handwriting of Defendant Jones, but he adduces no evidence to substantiate this assertion beyond his speculation. *See* Pl. Opp. at 24 (citing Pl. Ex. 3 at ¶¶ 3-4, ECF No. 78-4).[15]

Defendants have submitted evidence that Maiga's staff reviewed the hearing records and GCI staff's recommendation that placement on Chronic Discipline was warranted and agreed with that recommendation. Miaga himself reviewed the same material and his staff's recommendation, and approved the placement. *See* Defs. Ex. B, Maiga Decl. at ¶¶ 8-9. He then authorized his staff to sign the form approving the placement in his name. *Id.* ¶ 9. Plaintiff has

administrative directive or other prison policy "do not state a claim of a violation of an inmate's constitutional rights." *Olivencia v. Pun*, No. 3:21CV00739 (KAD), 2021 WL 3173137, at *4 (D. Conn. July 27, 2021).

[15] Plaintiff appears to indicate that Jones's handwriting on his inmate request dated March 13, 2018 (ECF No. 1-1 at 30) matches the signature approving his Chronic Discipline status (ECF No. 59-7 at 10). But Deputy Warden Jones avers that she did not sign Maiga's name to approve Plaintiff's Chronic Discipline status (Defs. Ex. C, Jones Decl. at ¶ 14, ECF No. 59-6). And Plaintiff has not shown that he has any expertise in handwriting analysis. Plaintiff's conclusory and speculative assertions do not raise a disputed issue of fact. *See Forte v. Liquidnet Holdings, Inc.*, 675 F. App'x 21, 25 (2d Cir. 2017). ("[r]eliance on conclusory statements or mere allegations is not sufficient to defeat summary judgment").

not provided any evidence to support his belief that his Chronic Discipline placement was approved without authorization. Based on the present evidentiary record, no reasonable juror could conclude that Plaintiff was denied due process of law based on an unauthorized approval of his Chronic Discipline status.

Qualified Immunity

To the extent that the more stringent procedural due process requirements of *Wolff* apply because Chronic Discipline should be considered a disciplinary determination, Defendants are entitled to qualified immunity.

The qualified immunity doctrine shelters a defendant whose "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Brandon v. Kinter*, 938 F.3d 21, 39 (2d Cir. 2019) (internal quotation marks omitted). A right is clearly established when "(1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful." *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004) (internal quotation marks and alterations omitted). Even when a right is clearly established, defendants "may nonetheless establish immunity by showing that reasonable persons in their position would not have understood that their conduct was within the scope of the established prohibition." *LaBounty v. Coughlin*, 137 F.3d 68, 73 (2d Cir. 1998) (internal quotation marks omitted). "[I]f a reasonable officer might not have known for certain that the conduct was unlawful—then the officer is immune from liability." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017).

This Court's research identified no Second Circuit or Supreme Court precedent that "clearly established" that the procedural protections of *Wolff* applied to the determination of Plaintiff's Chronic Discipline status at the time relevant to this action. Thus, the Court concludes that Defendants did not violate a clearly established right, and that it was objectively reasonable for the defendant prison officials to believe that the procedures afforded to Plaintiff for his Chronic Discipline determination did not violate his Fourteenth Amendment procedural due process rights. Accordingly, the Court will also grant the motion for summary judgment on Plaintiff's Fourteenth Amendment procedural due process claim arising from his Chronic Discipline determination on the basis of Defendants' entitlement to qualified immunity.

## B.     Fourteenth Amendment Procedural Due Process: Periodic Reviews

The Court permitted Plaintiff to proceed on a procedural due process claim against Director Maiga and Deputy Commissioner Rinaldi for their alleged failure to conduct meaningful review of his Chronic Discipline placement. IRO at 14-15.

In *Hewitt*, the Supreme Court held that "prison officials must engage in some sort of periodic review of the confinement" for an inmate placed on administrative segregation or detention to ascertain "whether [the inmate] remains a security risk."459 U.S. at 477 n.9. These reviews are necessary to ensure that prison officials are not using "administrative segregation . . . as a pretext for indefinite confinement of an inmate." *Id.* The Second Circuit has observed that periodic reviews of an inmate's placement in administrative segregation are "flexible and may be based on 'a wide range of administrative considerations,'" including observations of the inmate in administrative segregation, knowledge about prison conditions, misconduct charges, ongoing

tensions in the prison, and any ongoing investigations. *Proctor*, 846 F.3d at 609 (quoting *Hewitt*, 459 U.S. at 477 n.9).

Defendants argue that Defendants Rinaldi and Maiga had no personal involvement in any due process violation based on a lack of periodic reviews. "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (internal quotation marks omitted). As there is no special rule for supervisory liability, a "plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' . . . The violation must be established against the supervisory official *directly*." *Tangreti v. Backmann*, 983 F.3d 609, 618 (2d Cir. 2020) (emphasis added) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). Thus, Plaintiff must show that Defendants Rinaldi and Maiga, who are both high-ranking prison officials, had direct personal involvement in a due process violation based on their failure to conduct his periodic reviews.

In his declaration, Garner RHU unit manager Captain Hurdle states that he and the unit counselor reviewed the Chronic Discipline inmates, including making decisions regarding an inmate's progression through the phases. Defs. Ex. E, Hurdle Decl. at ¶ 18, ECF No. 59-8. He avers that Interval I Chronic Discipline inmates were subject to weekly review to determine whether they should be downgraded from Restraint Status I to Restraint Status II. *Id.* at ¶ 29. He indicates that Plaintiff was progressed on May 20, 2018 from Interval I to Interval II. *Id.* at ¶ 19.

Deputy Commissioner Rinaldi and Director Maiga aver that facility staff complete the periodic reviews for inmates on Chronic Discipline status. Defs. Ex. A, Rinaldi Decl. at ¶ 6, ECF No. 59-4; Defs. Ex. B, Maiga Decl. at ¶ 12. Both Rinaldi and Maiga declare that they had no

involvement in conducting Garner RHU inmate periodic reviews and that they would have

forwarded Plaintiff's complaint about his lack of periodic reviews to another prison official.

Defs. Ex. A, Rinaldi Decl. at ¶¶ 6-7; Defs. Ex. B, Maiga Decl. at ¶¶ 12-15.

Plaintiff disagrees with Captain Hurdle's representation that he was progressed to

Interval II. *See* Pl. Opp. at 27 (citing Pl. Ex. 4 at 29, ECF No. 78-5). But he adduces no evidence

to raise any reasonable inference that Rinaldi or Maiga had direct involvement in conducting his

periodic reviews or any failures to conduct them while he was a Garner Chronic Discipline

inmate. His allegation that he sent them a grievance about periodic reviews, even if true, does not

raise a genuine dispute of material fact, because of the Defendants' evidence that conducting

periodic reviews was the responsibility of other prison officials and that they would have

forwarded his grievance to those officials had they received it. *See e.g.*, *Farid v. Goord*, 200 F.

Supp. 2d 220, 235 (W.D.N.Y. 2002) (no personal involvement where supervising prison official

received prisoner's complaint "and sent it down the chain of command for investigation").

As no reasonable juror could conclude on this record that Defendants Rinaldi and Maiga

violated Plaintiff's Fourteenth Amendment procedural due process right to periodic reviews

while he was a Garner Chronic Discipline inmate in 2018, the Court must grant the motion for

summary judgment in Defendants' favor on this claim.

### C.    Conditions of Confinement

The Supreme Court has held that an inmate's conditions of confinement may be

"restrictive or even harsh" but may "not involve the wanton and unnecessary infliction of pain"

or violate "contemporary standard[s] of decency." *Rhodes v. Chapman*, 452 U.S. 337, 347

(1981) (citation omitted). To state a claim of deliberate indifference to health or safety due to

unconstitutional conditions of confinement, an inmate must demonstrate both an objective and a subjective element. To meet the objective element, the inmate must allege that he was incarcerated under a condition or a combination of conditions that resulted in a "sufficiently serious" deprivation of a life necessity or a "human need[]" or posed "a substantial risk of serious harm" to his health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Rhodes*, 452 U.S. at 347. The Supreme Court has identified the following basic human needs or life necessities of an inmate: food, clothing, shelter, medical care, warmth, safety, sanitary living conditions, and exercise. *See Wilson*, 501 U.S. at 304; *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989); *Rhodes,* 452 U.S. at 348. Conditions are considered in combination when they have a "mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example a low cell temperature at night combined with a failure to issue blankets." *See Wilson v. Seiter*, 501 U.S. 294, 304 (1991).

Courts generally find unconstitutional conditions of confinement when the duration of the deprivation is sufficiently long or when it is an ongoing condition, rather than a single, isolated incident. *Willey*, 801 F.3d at 68 (Eighth Amendment conditions claim may satisfy the objective element depending on "both the duration and the severity of the exposure."); *see, e.g.*, *Jusino v. Quiros*, No. 3:21-CV-620 (SRU), 2021 WL 5111908, at *6 (D. Conn. Nov. 3, 2021) (Plaintiff had plausible Eighth Amendment claim based on more than eleven months of 23 hours of lockdown during the week and 48 hours of lockdown on the weekends and no interaction with others except during one hour of exercise).

To meet the subjective element, an inmate must allege that the defendants possessed culpable intent, that is, they knew that the inmate faced a substantial risk to his or her health or safety and disregarded that risk by failing to take corrective action. *See Farmer*, 511 U.S. at 834, 837. This means "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (citations and internal quotations marks omitted). "Evidence that a risk was 'obvious or otherwise must have been known to a defendant' may be sufficient for a fact finder to conclude that the defendant was actually aware of the risk." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (quoting *Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003)).

1.    Isolation, Cell-Time, Limited Exercise

The Court permitted Plaintiff to proceed on Eighth Amendment claims based on isolating and restrictive conditions requiring him to remain in his cell for 23 hours on weekdays and 24 hours on weekends with only one hour of exercise during the weekdays and none during the weekend. IRO at 16-18

Defendants represent that Plaintiff's conditions in the Garner RHU while on Chronic Discipline status—including two days per week without any out-of-cell of time or recreation— were consistent with DOC's Administrative Directives during his confinement in the Garner RHU from April 20 to June 6, 2018 (47 days). *See* Defs. Mem. at 25-26; Defs. Ex. E, Hurdle Decl. at ¶¶ 16, 20.

 "The Second Circuit has not held that solitary confinement, as a matter of law, violates the Eighth Amendment." *Jusino*, No. 3:21-CV-620 (SRU), 2021 WL 5111908, at *6. And the Second Circuit recently vacated a summary judgment granted on Eight Amendment grounds to a

Connecticut DOC inmate on "special circumstances high security" status who made a "solitary confinement" claim based on his alleged 21 to 22 hours of confinement each day. *See Reynolds v. Arnone*, 402 F. Supp. 3d 3 (D. Conn. 2019), *aff'd in part, vacated in part, remanded sub nom. Reynolds v. Quiros*, 990 F.3d 286 (2d Cir. 2021). In *Reynolds*, the district court had reasoned that the inmate's restrictive and isolating confinement of indefinite duration, which he had endured for 23 years, satisfied the Eighth Amendment's objective element based on "the harmful effects described by the growing body of research on social isolation and mental health." *Id.* at 20 (citing to, *inter alia*, Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 Crime & Delinquency 124, 132 (2003)). The Second Circuit, however, found that there were disputed issues of material fact about whether the plaintiff's confinement was in fact 21 to 22 hours per day and more generally about whether his conditions could be characterized as solitary confinement. *Reynolds*, 990 F.3d at 294-95 ("if the imposed conditions did constitute solitary confinement, Reynolds could arguably prevail on his claim[] alleging [a] violation[] of the Eighth Amendment . . . .").

Plaintiff's restricted confinement in Garner's RHU lasted from April 20 to June 6, 2016—about six weeks. This fact alone distinguishes his case from cases upholding or at least entertaining findings that prolonged or indefinite periods of restricted segregations may give rise to cruel and unusual punishment under the Eighth Amendment. *Porter v. Clarke*, 923 F.3d 348, 357 (4th Cir. 2019), *as amended* (May 6, 2019) (noting that "prolonged solitary confinement exacts a heavy psychological toll that often continues to plague an inmate's mind even after he is resocialized" and that "[t]he challenged conditions of confinement on Virginia's death row—under which Plaintiffs spent, for years, between twenty-three to twenty-four hours a day alone, in

a small . . . cell with no access to congregate religious, educational, or social programming—

pose a substantial risk of serious psychological and emotional harm." (internal quotation marks

and alteration omitted)); *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 666 (7th Cir. 2012)

(recognizing "prolonged confinement in administrative segregation may constitute a violation of

the Eighth Amendment (and therefore the Fourteenth), depending on the duration and nature of

the segregation and whether there were feasible alternatives to that confinement"); s*ee also*

*Reynolds*, 402 F. Supp. 3d at 16-20 (noting cases and literature discussing deleterious effects on

inmates caused by prolonged, "indefinite" or years of confinement in isolating conditions).

Decisions from within this district have held that segregation conditions similar to those

Plaintiff complains of in Garner RHU do not constitute a deprivation of a basic human need. *See*

*Eckert v. Grady*, No. 3:19-CV-982 (VAB), 2020 WL 3129478, at *11 (D. Conn. June 12, 2020)

(finding no deprivation of basic human need arising from conditions of SRG Phase 3 imposed on

plaintiff for two distinct three-month periods, including limited access to telephone calls, visits

from family members, limitations on haircuts, restriction on mail in his cell, restrictions on

recreation, and confinement in cell 23 hours a day, including for meals); *Doyle v. Santiago*, No.

3:19-CV-901 (MPS), 2019 WL 5298147, at *8 (D. Conn. Oct. 18, 2019) (holding that no

objective deprivation occurred where plaintiff's two-year confinement in SRG Program

conditions included only one hour of outdoor recreation per weekday with 23 hours in the cell,

visits only from immediate family, limited telephone calls, no access to books, and no

programming); *Pagan v. Dougherty*, No. 3:18-cv-1668 (VLB), 2019 WL 2616975, at *6 (D.

Conn. June 26, 2019) (allegations that, during  two-year administrative confinement in SRG

program, prisoner was deprived of telephone use, visits from friends and family, eligibility for

26

parole, access to educational and vocational services; showers were limited to three per week; and prisoner was confined in his cell for 23 hours per day did not support objective component of Eighth Amendment claim for inhumane conditions of confinement) (citing cases).

Finally, to the extent that Plaintiff's cell time and exercise conditions did violate Eighth Amendment standards, Defendants are entitled to qualified immunity because no Second Circuit or Supreme Court precedent had "clearly established" at the time of Plaintiff's Garner RHU confinement in 2018 that restrictive conditions similar to those imposed upon Plaintiff violate Eighth Amendment standards. Thus, Defendants did not violate a clearly established right, or it was at least objectively reasonable for prison officials to believe at the time that the restrictive conditions—23 hours of cell-time during the week with one hour of out-of-cell recreation and 24 hours of cell time on the weekend—imposed during Plaintiff's RHU confinement from April 20 to June 6, 2018 did not violate the Eighth Amendment.

Accordingly, the Court will grant the motion for summary judgment in Defendants' favor on Plaintiff's claim of Eighth Amendment violation arising from his alleged isolation and insufficient exercise on the basis of both the merits and qualified immunity.

2.      Hygiene and Unsanitary Conditions

The Court permitted Plaintiff to proceed on his Eighth Amendment claims based on his inability to maintain his personal hygiene and sanitary cell conditions during his Garner RHU confinement on Chronic Discipline status. IRO at 19.

Inmates have a right to sanitary living conditions and the necessary materials to maintain adequate personal hygiene. *See Taylor v. Riojas*, 141 S. Ct. 52, 53 (2020) (Eighth Amendment was violated by conditions of "a pair of shockingly unsanitary cells": one that was "covered,

27

nearly floor to ceiling, in massive amounts of feces" and the second was "frigidly cold cell" and "equipped with only a clogged drain in the floor to dispose of bodily wastes.") (internal citations omitted); *Walker,* 717 F.3d at 127 (citing cases for the proposition that "the failure to provide prisoners with toiletries and other hygienic materials may rise to the level of a constitutional violation").

Except in extreme cases, *see Taylor*, 141 S. Ct. 52, temporary or occasional deprivations related to personal hygiene or sanitary conditions do not generally violate the Eighth Amendment. *See Trammell v. Keane*, 338 F.3d 155, 165 (2d Cir. 2003) ("Deprivation of other toiletries for approximately two weeks—while perhaps uncomfortable—does not pose such an obvious risk to an inmate's health or safety to suggest that the defendants were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and that they also drew the inference.") (internal citation and alterations omitted); *Rahim v. Martin*, No. 3:23CV298 (MPS), 2023 WL 4745536, at *3 (D. Conn. July 25, 2023) ("the Eighth Amendment is generally not violated by an inmate's temporary or brief exposures to unsanitary conditions of confinement."); *Conley v. Aldi*, No. 3:18-cv-824(VAB), 2020 WL 1333501, at *5 (D. Conn. Mar. 23, 2020) (holding that temporary or occasional inability to "practice" personal hygiene does not constitute deprivation of basic human need); *Chavis v. Kienert*, No. 9:03-CV-0039(FJS/RFT), 2005 WL 2452150, at *21 (N.D.N.Y. Sept. 30, 2005) (alleged deprivations of toiletries for two months did not violate Eighth Amendment).

    a.    Hygiene Deprivations

Defendants have submitted evidence that Garner RHU inmates in 2018 (1) were permitted to keep deodorant and soap in their cell; (2) were provided with a disposable foam oral

hygiene stick to brush their teeth, and an inmate with concerns about his hygiene stick could alert staff to obtain a replacement; and (3) were not permitted full size toothbrushes because a sharpened, full-size toothbrush posed a threat to safety and security. Defs' Ex. E, Hurdle Decl. at ¶ ¶ 22-23.

Plaintiff admits that he was provided with toothpaste, a toothbrush or hygiene stick, and soap when he showered three times a week. Pl. Opp. at 34. Thus, Plaintiff experienced at most temporary deprivations of oral hygiene materials and soap. Based on this record, no reasonable jury could conclude that Plaintiff sustained a violation of his Eighth Amendment rights due to deprivation of soap, toothpaste, or a toothbrush.

With respect to the alleged deprivations concerning shaving and nail clipping, Captain Hurdle avers that RHU inmates were not permitted to keep razors or nail clippers in their cells due to safety and security concerns but could arrange for access to shaving materials in a designated cell or nail clippers under the supervision of medical staff. Defs. Ex. E, Hurdle Decl. at ¶¶ 24-25.  In his declaration, Plaintiff states that he would have been denied access to nail clippers if he had made such a request. Pl. Ex. 2, Pl. Decl. at ¶ 41. But Plaintiff cannot raise a question of fact based on his unsubstantiated speculation about how correctional staff would have responded to a request to use nail clippers under the supervision of medical staff. Plaintiff states further that he was "never permitted to shave in the [Garner] RHU[,]" "always denied a razor and opportunity to shave in the [Garner] RHU," that "there was no cell that inmates could be placed in to shave with a razor," and that "this did not exist." Pl. Ex. 2, Pl. Decl. at ¶ 42. The Court cannot "weigh the evidence" on a motion for summary judgment, but "a court does not err in granting summary judgment where the evidence presented is 'merely colorable' or is 'not

significantly probative.'" *In re Mosdos Chofetz Chaim Inc.*, 2023 WL 6532954, at *2 (2d Cir.

Oct. 6, 2023) (citing *Anderson*, 477 U.S. at 249-50); *Jeffreys v. City of New York*, 426 F.3d 549,

554 (2d Cir. 2005) (opposing party "must offer some hard evidence showing that its version of

the events is not wholly fanciful" in order to survive summary judgment). Plaintiff's claim that

he was denied a razor is vague, and he fails to aver or present any documentary evidence that he

made a shaving request that complied with RHU security measures but was denied. Especially in

light of the frequency with which the Plaintiff makes written requests, grievances, and other

complaints to staff, as is well-documented in this and the many other cases Plaintiff has filed in

this Court, his failure to point to a single document reflecting a request to shave is telling.

    In any event, Plaintiff has not submitted evidence to support his claim that the high-

ranking prison officials he sues on his claim, Deputy Warden Jones, Deputy Commissioner

Rinaldi or Director Maiga, were personally involved in any personal hygiene deprivations.

Plaintiff appears to concede that he did not address his hygiene deprivations with Director

Maiga. Pl. Opp. at 36-37 (noting he complained in writing to Maiga only about solitary

confinement and alleged Chronic Discipline program violations such as restraint use); Pl. Ex. 2,

Pl. Decl. at ¶ 61 (noting he complained in writing to Maiga about DOC staff failure to review his

Chronic Discipline status, to release him from Chronic Discipline, and to comply with Chronic

Discipline program standards).

    Plaintiff asserts that he sent complaints about his conditions to Jones and Rinaldi but

neither took any action on his grievances. Pl. Ex. 2, Pl. Decl. at ¶¶ 58-59. But "a defendant's

mere receipt of a letter or grievance, without personally investigating or acting thereon, is

insufficient to establish personal involvement." *Richard v. Corcella*, No. 3:20-CV-1354 (CSH),

2023 WL 4595695, at *4 (D. Conn. July 18, 2023) (citations omitted). Plaintiff also asserts that he personally spoke to Jones about his conditions on her weekly tours but she took no action. Pl. Ex. 2, Pl. Decl. at ¶ 58. But Plaintiff has not submitted any evidence to raise a reasonable inference that Jones was aware that he faced a serious risk of harm due to personal hygiene deprivations when he made his verbal complaint. *See, e.g., Oh v. Saprano*, No. 3:20-cv-237(SRU), 2020 WL 4339476, at *6 (D. Conn. July 27, 2020) (inmate's verbal complaint to high-ranking official could not, by itself, support official's personal involvement without some indication that "the complaining inmate was clearly in very serious, visible danger" when he made the verbal complaint).

Deputy Commissioner Rinaldi avers that she had no involvement with the housing conditions for Chronic Discipline inmates housed at Garner and would have forwarded any complaints about the conditions to the district administrator who oversaw that facility. Defs. Ex. A, Rinaldi Decl. at ¶ 8. Likewise, Deputy Warden Jones declares that she did not have authority over inmate conditions and day-to-day operation as the Deputy Warden for Treatment and Programs, and that she would have forwarded any complaint about conditions to the Deputy Warden for Operations. Defs. Ex. C, Jones Decl. at ¶¶ 3-6, 18; *see Farid*, 200 F. Supp. 2d at 235 (supervisor's receipt of inmate complaint and delegating response to other prison official does not establish supervisor's personal involvement).

Based on the present record, no reasonable jury could determine that Rinaldi, Jones, or Maiga was aware of but disregarded a substantial risk of serious harm to Plaintiff resulting from hygiene deprivations. *See Tangreti*, 983 F.3d at 612 ("for deliberate-indifference claims under the Eighth Amendment against a prison supervisor, the plaintiff must plead and prove that the

supervisor had subjective knowledge of a substantial risk of serious harm to an inmate and

disregarded it"). Accordingly, the motion for summary judgment will be granted in Defendants'

favor on this claim.

      b.      Unsanitary Conditions

Plaintiff claims that staff did not pick up food trays after each shift and denied him access

to cleaning supplies, forcing him to sweep his cell with his bare hands and live in filth with

bacteria and the odor of decaying food. Pl. Ex. 2, Pl. Decl. at ¶¶ 38-40.

Again, Plaintiff has not submitted evidence to support an inference that Jones, Rinaldi,

and Maiga had any direct involvement in this asserted Eighth Amendment violation by acting

with deliberate indifference to unsanitary conditions in the Garner RHU. No reasonable jury

reviewing the present record could conclude that they acted with conscious disregard of any

objectively serious unsanitary conditions presenting a risk to Plaintiff's health and wellbeing.

Accordingly, the motion for summary judgment will be granted in Defendants' favor on this

claim.

      3.      <u>Use of Out-of-Cell Restraints</u>

The Court permitted Plaintiff to proceed on his Eighth Amendment claim regarding being

restrained at all times while moving outside of his cell against Maiga, Jones, and Rinaldi. IRO at

20-22.

Generally, the use of restraints on an inmate does not violate the Eighth Amendment

unless it was "totally without penological justification," "grossly disproportionate," or

"involve[s] the unnecessary and wanton infliction of pain." *Smith v. Coughlin*, 748 F.2d 783, 787

(2d Cir. 1984) (citing *Rhodes v. Chapman,* 452 U.S. 337, 346, (1980)). As with other restrictions

32

imposed on inmates, the Court should "consider whether the use of restraints was reasonably calculated to restore prison discipline and security and, in that purposive context, whether the officials were deliberately indifferent to [Plaintiff's] health and safety." *Trammel*, 338 F.3d at 163. Because "the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions" courts must accord prison administrators "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547-48 (1979).

It is undisputed that Plaintiff was placed on Chronic Discipline status on April 20, 2018, after he had received at least five class A disciplinary reports within 180 days for offenses including security tampering, interfering with safety and security, threats, and public indecency. Defs. Rule 56(a)1 at ¶¶ 7-8. Under Administrative Directive 9.4, Plaintiff was required to be on "Restraint Status I" whenever he was outside of his cell during his first week of Chronic Discipline Interval I; after that week, prison officials determined his restraint status based on his behavior. *See* Defs. Ex. I, A.D. 9.4, ECF No. 59-12 at 31(Attachment C, Chronic Discipline Status - Provisions and Management Standards). In addition, Captain Hurdle's declaration explained that Plaintiff was on Administrative Detention or Punitive Segregation, in addition to Chronic Discipline status, for much of his time in RHU, and inmates on Administrative Detention or Punitive Segregation in the RHU were escorted in restraints while outside of their cell as a precaution due to their recent conduct warranting disciplinary review. Defs. Ex. E, Captain Hurdle Decl. at ¶¶ 12-15, 32; *see also* ECF No. 78 at 10 ¶ 37.

The Court concludes that no admissible evidence in the record raises a reasonable inference that Plaintiff was subjected to the use of restraints outside of his cell without any legitimate penological reason,[16] and so no reasonable jury could conclude that Plaintiff was subjected to the use of out-of-cell restraints in violation of the Eighth Amendment.

### C.    Fourth Amendment Violation Based On Strip Searches

The Court permitted Plaintiff to proceed on his claim of a Fourth Amendment violation against Director Maiga, Deputy Warden Jones, and Deputy Commissioner Rinaldi, based on his allegation that he was required to strip for a search before exiting his cell. *See* IRO at 21; Compl. at ¶ 61.

While "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell," "inmates retain a limited right of bodily privacy under the Fourth Amendment." *Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016). In assessing whether a correctional policy of strip searching inmates violates the Fourth Amendment courts consider whether the policy is reasonably related to legitimate penological interests, taking into account "(i) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (ii) whether there are alternative means of exercising the right in question that remain open to prison inmates; (iii) whether accommodation

---

[16] Plaintiff asserts that Deputy Warden Jones improperly altered the Provisions and Management Standards for Chronic Discipline status inmates. Pl. Opp. at 76; *See* Pl. Rule 56(a)2 at ¶ 40. Plaintiff supports his claim with his own averments about his restraints while out of cell. Pl. Ex. 2, Pl. Decl. at ¶ 33. He also points to a copy of Directive 9.4 Attachment C, showing the handwriting of an unidentified individual whom he claims—with no evidentiary support—is Defendant Jones. *See* Pl. Ex. 6 at 3, ECF No. 78-7. But this evidence fails to suggest that Plaintiff was subjected to out-of-cell restraints without a legitimate penological purpose.

Plaintiff also claims that he could not have been placed on Administrative Detention because he was already housed in the RHU. Pl. Rule 56(a)2 at ¶ 36. To the extent Plaintiff's status contravened the provisions of DOC Directive 9.4, prison staff's failure to comply with DOC directives or regulations does not give rise to an Eighth Amendment violation. *Davidson v. Fitzgerald*, No. 3:21-CV-63 (JCH), 2021 WL 6125617, at *4 (D. Conn. Dec. 28, 2021).

of the asserted constitutional right will have an unreasonable impact upon guards and other inmates, and upon the allocation of prison resources generally; and (iv) whether there are reasonable alternatives available to the prison authorities." *Covino v. Patrissi*, 967 F.2d 73, 78-79 (2d Cir. 1992). When evaluating a claim that an isolated search infringed that right, by contrast, a court must consider more situational factors: "(1) the scope of the intrusion; (2) the manner in which it was conducted; (3) the justification for initiating it; and (4) the place in which it was conducted." *Id.* at 58 (citing *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)). A strip search is unconstitutional under the Fourth Amendment "if it is unrelated to any legitimate penological goal or if it is designed to intimidate, harass, or punish." *Jean–Laurent v. Wilkerson,* 438 F. Supp. 2d 318, 323 (S.D.N.Y. 2006) (citations omitted). It is unclear whether Plaintiff is challenging a policy or a set of practices applicable only to him, but either way, his claim fails on this record.

Defendants have produced evidence to support their assertion that they had no personal involvement in creating or promulgating any policy or practice to strip search RHU inmates each time they exited their cell. Deputy Commissioner Rinaldi and Director Maiga aver that they were not aware of, or involved with the creation of, any policy that required Garner RHU inmates to be strip searched upon removal from their cells. Defs. Ex. A, Rinaldi Decl. at ¶ 10; Defs. Ex. B, Maiga Decl. at ¶ 17. And Deputy Warden Jones avers that she did not know of any Garner or DOC policy requiring Plaintiff's strip search each time he exited his RHU cell at Garner, and that, had Plaintiff complained about any such policy to her, she would have forwarded his complaint to the Deputy Warden for Operations at Garner, as inmate searches fell within that official's duties. Defs. Ex. C, Jones Decl. at ¶ 19. In addition, RHU Unit Manager Captain

Hurdle declares that there was no policy for RHU inmates to be strip searched whenever they exited their cell. Defs. Ex. E, Hurdle Decl. at ¶ 21.

Plaintiff counters that Deputy Commissioner Rinaldi was aware of the practice because he sent her his grievances about the conditions at the Garner RHU. Pl. Opp. at 33; Pl. Ex. 2, Pl. Decl. at ¶ 59. He also claims that he complained to Deputy Warden Jones about the strip searches and that she witnessed them. Pl. Ex. 2, Pl. Decl. at ¶¶ 34, 58. But Plaintiff has not submitted evidence to support any reasonable inference that Defendants had direct personal involvement in a Fourth Amendment violation arising from a requirement for RHU inmates to be strip searched whenever they exited their cells. *See Tangreti*, 983 F.3d at 616-17 ("A supervisor's 'mere knowledge . . . ' is not sufficient because that knowledge does not amount[ ] to the supervisor's violating the Constitution.") (quoting *Iqbal*, 556 U.S. at 677). No evidence suggests that Deputy Warden Jones knew that there was no legitimate penological reason for any strip searches she witnessed—for example, whether the strip search was a reasonable response to Plaintiff's May 25, 2018 disciplinary report, received while he was in RHU, for interfering with safety and security. ECF No. 59-8 at 4 ¶14; ECF No. 78 at 10 ¶ 38. As no reasonable jury reviewing the present evidentiary record could conclude that Maiga, Jones, and Rinaldi had any personal involvement in a Fourth Amendment violation based on RHU strip searches, the motion for summary judgment must be granted in Defendants' favor on this claim.

### D.    First Amendment Free Exercise

Plaintiff alleges that Deputy Commissioner Rinaldi and Deputy Warden Jones denied him the free exercise of his Native American religion by preventing him from participating in smudging practices and denying him access to a sweat lodge while housed in Garner's RHU.

Compl. at ¶¶ 63, 65.

Inmates "retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (citation omitted). But in the prison context, alleged violations of the right to free exercise are "judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Id.* at 349.

Thus, for a prisoner's claim of First Amendment free exercise deprivation, "a court must determine (1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; (2) whether the challenged practice of the prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers . . . legitimate penological objective[s]." *Kravitz v. Purcell*, No. 22-764, 2023 WL 8177114, at *11 (2d Cir. Nov. 27, 2023) (citing *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988)). As long as a restriction on an inmate's religious practice "is reasonably related to legitimate penological interests," it does not violate the First Amendment. *Turner*, 482 U.S. at 89 (1987). Courts must avoid "substitut[ing] [their] judgment [for that of prison officials] on difficult and sensitive matters of institutional administration." *See O'Lone*, 482 at 353 (internal quotation marks and alteration omitted).

To resist summary judgment on a free exercise claim, a plaintiff must submit evidence sufficient to raise an inference that a defendant acted with at least deliberate indifference in depriving an inmate of the ability to engage in a religious practice. *Kravitz*, No. 22-764, 2023 WL 8177114, at *12 (citing *Wiggins,* 2023 WL 8009312, at *8).

1.    Sweat Lodge

Garner did not have a sweat lodge during the events involved in this case. Plaintiff claims that Defendants violated his First Amendment right to free exercise by refusing to transfer him to a facility with a sweat lodge without a legitimate penological reason. Pl. Opp at 38; *see* Pl. Ex. 2, Pl. Decl. at ¶ 59.

This Court has twice rejected Plaintiff's First Amendment claim based on his lack of access to a sweat lodge. *See Baltas v. Erfe*, No. 3:19CV1820 (MPS), 2022 WL 4260672, at *11-12 (D. Conn. Sept. 15, 2022); *Baltas v. Chapdelaine*, No. 3:17-CV-242 (RNC), 2022 WL 4599155, at *10 (D. Conn. Sept. 30, 2022), finding each time that the prison official defendants were entitled to qualified immunity.

In *Baltas v. Erfe*, the Court determined that there was "no Second Circuit or U.S. Supreme Court precedent that specifically addresses an inmate's First Amendment right either to demand construction of a sweat lodge within a prison facility, or to transfer to a prison facility with sweat lodge access, to accommodate the inmate's free exercise of the Native American religion." *Baltas*, 2022 WL 4260672, at *12 (D. Conn. Sept. 15, 2022) (citing *Buckles v. Crowe*, 2021 WL 1341887, at * 6 (D. Mont. Feb. 22, 2021) ("no clearly established constitutional right to access a sweat lodge in prison to practice the Native American religion.")). In *Baltas v. Chapdelaine*, the Court discerned "[n]o relevant case authority . . . that addresses the First Amendment free exercise rights of inmates to participate in sweat lodge … services." *Baltas*, 2022 WL 4599155, at *10. Most recently, this Court dismissed as not plausible another inmate's claim that the warden's refusal to transfer him "to an appropriate facility where he can properly practice his religious freedoms" infringed his religious rights. *Mitchell v. Martin*, No. 3:23-CV-

38

902 (JAM), 2023 WL 8114344, at *6 (D. Conn. Nov. 22, 2023). In *Mitchell*, the Court recognized that the inmate-plaintiff had "a right to practice his religion" but held that "he does not have a right to be incarcerated in the prison of his choice, even if he believes that other institutions would be more accommodating to his religious beliefs." *Id.* (citation omitted).

This Court can identify no authority suggesting that prison officials violated any clearly established First Amendment right by failing to transfer Plaintiff from Garner to another facility with a sweat lodge. *See e.g.*, *Pevia v. Moyer*, No. CV DLB-19-327, 2022 WL 991399, at *7 (D. Md. Mar. 31, 2022) ("in the latter half of 2018, there was no Supreme Court or Fourth Circuit decision guaranteeing a maximum-security prisoner the right to participate in a sweat lodge ceremony. And there still is none today. The Court has identified out-of-circuit decisions on a prisoner's access to a sweat lodge ceremony, but none has held that a prisoner, regardless of classification, has a constitutional right to participate in the ceremony."). Thus, it was objectively reasonable for prison officials to believe that denying Plaintiff's request for a transfer so that he could participate in sweat lodge services did not violate his First Amendment free exercise rights. Accordingly, consistent with its prior rulings, the Court will grant the motion for summary judgment because Defendants are entitled to qualified immunity on this First Amendment free exercise claim.

2.    Smudging

Plaintiff complains that he was denied an ability to engage in Native American smudging, which involves burning herbs to be rubbed on the body while praying for spiritual healing, and that he was not even afforded an opportunity to engage in "dry smudging" with the use of a

feather as a fan (which he characterizes as a fraudulent alternative for true smudging practice) while he was in the Garner RHU in 2018. Pl. Opp. at 38-42; Pl. ex 2, Pl. Decl. at ¶¶ 49-52, 57.

Defendants submit evidence that Garner RHU inmates practicing the Native American religion were not permitted to perform traditional smudging due to safety and security concerns about their use of burning materials. *See* Defs. Ex. E, Hurdle Decl. at ¶ 35; Defs Ex. F, Athey Decl. at ¶¶ 12-14. But the record shows that Garner RHU took steps to accommodate Plaintiff's religious beliefs, allowing inmates who were ineligible for traditional smudging to participate in "dry smudging" ceremonies within their cell as an alternative to traditional smudging practices, which involved the use of matches or a lighter. Defs. Ex. E, Hurdle Decl. at ¶ 35. *See* Defs. Ex. F, Athey Decl. at ¶¶ 14, 18, *id.* at 8-9 (Memorandum of Understanding and Use Agreement for Individual Smudging signed by Plaintiff). It also shows that Plaintiff was aware of Garner's smudging program, including the "dry smudging" alternative for inmates "ineligible . . . to smudge in the traditional manner;" Defs. Ex. F, Athey Decl. at 8-9; and that Plaintiff was advised how to arrange for his participation in dry smudging while in the Garner RHU. *See* Defs. Ex. G, Guaman Decl. at 16, 35 (Level 1 and 2 Grievance responses dated May 1 and June 5, 2018, advising Plaintiff how to arrange for smudging as permitted in RHU).

To the extent that Plaintiff claims deprivation of his free exercise rights based on an inability to engage in traditional smudging practices, Defendants are entitled to qualified immunity. Prison officials may curtail an inmate's religious rights for legitimate penological reasons. *See Matiyn v. Henderson,* 841 F.2d 31, 37 (2d Cir. 1988) (affirming district court's determination "that [plaintiff] was prevented from attending communal services [while in administrative segregation] for reasons related to legitimate penological objectives, and that his

[First Amendment] claim was therefore without merit"); *see also Wiggins*, 2023 WL 8009312, at *6 (noting incarcerated individuals have right to engage in religious exercise absent penological justification for the denial).

Thus, due to safety and security concerns presented by RHU inmates—many of whom, like Plaintiff, have disciplinary issues—it was objectively reasonable for prison officials to believe at the relevant time that prohibiting Plaintiff's burning of materials to smudge did not violate his clearly established rights. *Appel v. King Cnty.*, No. 2:21-CV-00621-TL-JRC, 2023 WL 2529443, at *9 (W.D. Wash. Feb. 1, 2023), *report and recommendation adopted*, No. 2:21-CV-00621-TL-JRC, 2023 WL 2527100 (W.D. Wash. Mar. 15, 2023) (concluding restriction on smudging involving burning was supported by legitimate interests for safety and security); *Elliot v. Snyder*, No. 2:18-CV-0085, 2020 WL 5351084, at *5 (W.D. Mich. May 13, 2020) (noting Eighth Circuit and district court cases within that Circuit have found that policies limiting inmates' right to burn tobacco and herbs were valid).

To the extent he claims he was not able to engage in "dry smudging," Plaintiff has not submitted evidence to raise an inference that either Deputy Warden Jones or Deputy Commissioner Rinaldi had any personal involvement in depriving Plaintiff of an opportunity to engage in "dry smudging" as permitted during his 2018 Chronic Discipline status in the Garner RHU. Plaintiff asserts that Jones and Rinaldi were aware of his complaint about being deprived of his religious right to smudge. Pl. Opp. at 41-42. But Captain Hurdle responded to Plaintiff's inmate request concerning his smudging deprivation in the RHU, and the Garner Warden and the District Administrator answered his subsequent Level 1 and 2 Grievances complaining about his inability to smudge. Pl. Ex. 2, Pl. Decl. at 22-25(Grievances). Both the Level 1 and Level 2

responses advised Plaintiff about how he should request participation in "dry smudging" in the

Garner RHU. *Id.* Although Captain Hurdle denied Plaintiff's inmate request for "smudging

materials,"[17] the Warden and District Administrator later informed him that he was permitted to

practice "dry smudging" in the RHU. *Id.* at 22-25.

No evidence suggests that Jones and Rinaldi acted to deny Plaintiff access to "dry

smudging" as permitted in the RHU. Nor does the record support an inference that either Jones

or Rinaldi was aware of and ignored that Plaintiff was deprived of the opportunity to practice

"dry smudging" in his cell. No reasonable juror could conclude that either Jones or Rinaldi

should be liable for a First Amendment free exercise deprivation.[18]

### E.     Fourteenth Amendment Equal Protection

The Court permitted Plaintiff to proceed on a Fourteenth Amendment equal protection

claim against Warden Jones and Deputy Commissioner Rinaldi. IRO at 26. Plaintiff claims that

---

[17] It is unclear what materials Plaintiff requested in his inmate request, but his Level 1 Grievance appears to refer to traditional smudging materials as he suggests that he be permitted to smudge outside in the recreation yard to alleviate safety or security concerns. *Id.* at 23. Further, given Plaintiff's view that "dry smudging" "is [n]ot an accepted Native American practice or meaningful substitute [for] smudging," and is "fraudulent," it seems likely that his request for "smudging materials" included herbs and the means to burn them, not just a feather. *See* ECF No. 76 at 40-41.

[18] Plaintiff claims that Defendants have not responded to his claim that they deprived him of congregate religious services. Pl. Opp. at 37. Plaintiff's complaint referenced his lack of congregate religious services and alleged deprivations of his Native American religious smudging and sweat lodge practices. It is otherwise unclear what congregate religious practices Plaintiff was denied while in the RHU. Plaintiff cannot mention a claim without providing factual support for that claim. *Burke v. Lamont*, No. 3:22-CV-475 (OAW), 2022 WL 3997549, at *14 (D. Conn. Sept. 1, 2022). Even if Plaintiff asserts a First Amendment claim based on his lack of congregate services involving smudging and sweat lodge services, qualified immunity applies. The record concerning Plaintiff's disciplinary history substantiates that it was objectively reasonable for prison officials to believe that restricting Plaintiff's access to congregate religious services in the RHU did not violate his First Amendment rights. *See Matiyn*, 841 F.2d at 37 (agreeing with district court's holding that inmate's free exercise claim lacked merit because he was precluded from attending congregate services while in administrative segregation due to legitimate penological reasons); *see also Baltas v. Erfe*, No. 3:19CV1820 (MPS), 2022 WL 4260672, at *12-14 (D. Conn. Sept. 15, 2022) (defendants had qualified immunity as to Plaintiff Baltas's free exercise claim that they denied him access to congregate religious services while he was in administrative segregation "[b]ecause existing Supreme Court and Second Circuit precedent does not clearly bar prison officials from prohibiting all inmates placed in

he was unable to smudge while other Native American-designated inmates were able to smudge. Pl. Opp. at 42; Compl. at ¶ 64.

The Equal Protection Clause requires that the government treat all similarly situated people alike. *Harlen Assocs. v. Inc. Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001). To state an equal protection claim, a plaintiff must allege facts showing that: (1) he was treated differently from similarly situated individuals and (2) that the selective treatment was motivated by an intention to discriminate on the basis of "impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000) (citations omitted).

When a suspect classification is not at issue, a plaintiff still may bring a "class of one" equal protection claim by alleging that he or she "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). In the Second Circuit, a class-of-one plaintiff "must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Clubside v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) (citation omitted). The similarity between the plaintiff and comparators provides "an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose—whether personal or otherwise—is all but certain." *Witt v. Village of Mamaroneck*, No. 12-CV-8778 (ER), 2015 WL 1427206, at *5

---

[administrative segregation] (who have, by definition, been deemed dangerous or disruptive) from attending group worship . . . .").

(S.D.N.Y. Mar. 27, 2015), *aff'd*, 639 F. App'x 44 (2d Cir. 2016) (quoting *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005)).

To survive a motion for summary judgment on this claim, Plaintiff must submit sufficient evidence to support an inference of discriminatory intent. *See, e.g., Weser v. Glen*, 190 F. Supp. 2d 384, 406–07 (E.D.N.Y.), *aff'd*, 41 F. App'x 521 (2d Cir. 2002) (granting summary judgment where Plaintiff failed to produce evidence sufficient to support inference of intentional discrimination); *see also Knight v. Connecticut Dep't of Pub. Health*, 275 F.3d 156, 166 (2d Cir. 2001) ("Appellants must also prove that decisionmakers in [their] case [s] acted with discriminatory purpose").

Plaintiff provides no evidence or argument to suggest a suspect classification, and so he must proceed as a class-of-one plaintiff. He offers only a conclusory assertion that he was treated differently from other Garner inmates who were able to smudge and offers himself as a comparator. *See* Pl. Opp. at 42 ("there can be no more similar comparison than himself with himself in the exact same [Garner] RHU").

Qualified immunity shields Defendants from liability. It was objectively reasonable for prison officials to believe that they did not violate the Equal Protection Clause by depriving Plaintiff—who was in the RHU on Chronic Discipline due to his disciplinary history and who received additional disciplinary reports while he was in the RHU—from engaging in traditional smudging practices with burning materials while other inmates were permitted to engage in traditional smudging. Even if some of those other inmates were also in the RHU, as Plaintiff

44

asserts, he points to no evidence that their disciplinary profiles showed "an extremely high degree of similarity" to his.[19]

Accordingly, the Court grants Defendants' motion for summary judgment on Plaintiff's Fourteenth Amendment equal protection claims.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. The clerk is instructed to close this case.

**So Ordered** this 21st day of December, 2023.


　　　　　　　　　　　　 /s/
　　　　　　　　　　 Michael P. Shea
　　　　　　　　　　 United States District Judge

---

[19] To the extent that Plaintiff's equal protection claim is premised on his asserted deprivation of "dry smudging," no jury could reasonably conclude after review of the present record that Defendants Jones or Rinaldi acted with an impermissible discriminatory animus or with intent to treat Plaintiff differently from other similarly situated inmates who were able to engage in "dry smudging." As shown above, Plaintiff has pointed to no evidence suggesting Jones or Rinaldi was personally involved in any deprivation of Plaintiff's right to participate in "dry smudging."